UNITED STATES of America, Plaintiff–Appellee, Cross–Appellant,

v.

Frederick R. DRAVES, Defendant–Appellant, Cross–Appellee.

Nos. 96–1408, 96–1666.

United States Court of Appeals, Seventh Circuit.

Argued Oct. 24, 1996.

Decided Jan. 3, 1997.

Rehearing Denied Feb. 28, 1997.

Andrew B. Baker, Jr., Office of U.S. Atty., Dyer, IN, Donald J. Schmid (argued), Office of U.S. Atty., South Bend, IN, for U.S.

James J. Shea (argued), Daniel J. Palmer, Hunt, Suedhoff, Borror & Eilbacher, Fort Wayne, IN, for Frederick L. Draves.

Before CUMMINGS, ESCHBACH, and FLAUM, Circuit Judges.

ESCHBACH, Circuit Judge.

A jury convicted Frederick R. Draves of aiding and abetting credit card fraud in violation of 15 U.S.C. § 1644(a) and 18 U.S.C. § 2. On appeal, Draves challenges his conviction on jurisdictional, sufficiency of the evidence, and ineffective assistance of counsel grounds. The government counterappeals Draves' sentence, challenging the district court's refusal to apply a sentencing enhancement for obstruction of justice. We affirm both Draves' conviction and his sentence.

## I. FACTS

On June 16, 1994, while enjoying a post-softball game beer at the City Limits Bar in South Bend, Indiana, Keith Hodgson discovered that his wallet was missing. Among other things, the wallet contained Hodgson's automatic teller machine card and his mother's VISA Gold card, an account on which Keith Hodgson was an authorized signatory. The thief was Jill Parmelee, who stole the wallet and then left the bar with the defendant, her acknowledged lover and periodic roommate since early 1994.

Immediately after the theft, Draves drove Parmelee on several errands. First, Draves took Parmelee to a nearby automatic teller machine ("ATM"), where Parmelee tried in vain to withdraw money from Hodgson's account using the stolen ATM access card. After Parmelee made several unsuccessful attempts to enter the correct personal identification number, the machine confiscated the card. Draves' next stop was a Meijer department store located on Grape Road in Mishawaka, Indiana, where Parmelee charged $298.20 worth of merchandise to the stolen VISA Gold card at 1:30 a.m. Draves then drove Parmelee to a second Meijer store, this one located on Portage Road in South Bend, where Parmelee charged another $714.69 worth of merchandise to the card at 2:41 a.m. Parmelee testified that Draves assisted her with these purchases by driving her to the stores, accompanying her into the stores, and carrying the merchandise to the car. Draves received merchandise from at least one of the transactions. The second Meijer store purchase was captured on store

surveillance videotape, which revealed that Draves accompanied Parmelee through the checkout lane, and waited with her for approximately fifteen minutes while the transaction was processed. Parmelee then returned to the Mishawaka Meijer store, where she charged another $347.60 worth of merchandise to the stolen card at 4:49 a.m. Draves insists, and Parmelee testified, that Draves did not accompany Parmelee on this third shopping trip. Parmelee also testified that she made these hurried, pre-dawn shopping sprees to maximize her purchasing power before the card was reported stolen.

On September 6, 1995, the government returned an eight count indictment charging Parmelee, Draves, and three other participants with this and other related fraudulent credit card use. At trial, Draves contended, as he does here, that he was unaware that the credit card did not belong to Parmelee. After a two-day trial, the jury found Draves guilty of count 5 of the indictment, which alleged that Draves knowingly used or attempted to use a fraudulently obtained credit card in violation of 15 U.S.C. § 1644(a) and 18 U.S.C. § 2. Both Draves' counsel, and Draves himself proceeding *pro se*, filed motions for judgment of acquittal. Both motions were denied. The district court sentenced Draves to ten months imprisonment, a three year post-release supervision period, a $2,500 fine, and restitution payable to the issuing company of the stolen credit card. On this direct appeal, which we hear pursuant to 18 U.S.C. § 3742(a), Draves challenges his conviction, and the government challenges the sentence.

## II. DISCUSSION

Draves makes three challenges to his conviction: 1) the district court lacked jurisdiction under § 1644(a); 2) the district court erred in denying his motion for judgment of acquittal; and 3) his trial counsel's assistance was ineffective. The government counterappeals Draves' sentence on the grounds that the district court should have, but did not,

give an obstruction of justice enhancement. We proceed by issue.

### 1. Jurisdictional Challenge

Title 15 U.S.C. § 1644(a) punishes the knowing use of a fraudulently obtained credit card to acquire "money, goods, services, or anything else of value which within any one-year period has a value aggregating $1,000 or more." Draves challenges the jurisdiction of the district court because he argues that this dollar minimum, which is required for prosecution under the statute, was not met. Our review of a challenge to the district court's subject-matter jurisdiction is *de novo*.[1] *Waid v. Merrill Area Pub. Sch.*, 91 F.3d 857, 860 (7th Cir.1996). Although we agree that the $1,000 statutory minimum is jurisdictional, *see United States v. DeBiasi*, 712 F.2d 785, 790 (2d Cir.1983), we conclude that this minimum was met.

On the night of the fraudulent shopping spree, Parmelee made three purchases at two different Meijer department stores. The first purchase was at the Mishawaka Meijer store for $298.20, the second at the South Bend Meijer store for $714.69, and the third back at the Mishawaka Meijer store for $347.60. Parmelee testified that Draves did not accompany her for the third shopping trip. Even accepting this testimony, however, the first two purchases (which Draves indisputably aided by providing transportation) total $1012.89 if we include sales tax in the statutory aggregate value.

Draves argues that because he was only privy to the first two purchases, and because the combined retail ticket price of those two purchases *before* sales tax equaled $941, he cannot be charged under § 1644(a). The government counters that sales tax can be included in the calculation of the $1,000 threshold jurisdictional value under § 1644(a). In the alternative, the government argues that it proved Draves' involvement in Parmelee's third fraudulent purchase, and that even without sales tax, the

---

1. We note our inherent jurisdiction to decide issues of contested subject-matter jurisdiction. *See Christianson v. Colt Indus. Operating Corp.*, 798 F.2d 1051, 1056 n. 3 (7th Cir.1986) (citing *Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 541, 106 S.Ct. 1326, 1331, 89 L.Ed.2d 501 (1986)).

three purchases exceed $1,000. We need not reach this second argument, however, because we agree with the first: sales tax is includable in "aggregate value" under § 1644(a). We reject Draves' contention that "retail price" is synonymous with "value" under the statute.

In *United States v. Picquet*, the Fifth Circuit addressed this very issue when interpreting 18 U.S.C. § 1029(a)(2), which prohibits the use of unauthorized access devices to obtain "anything of value aggregating $1,000 or more." 963 F.2d 54 (5th Cir.1992). In *Picquet*, the court rejected the defendant's argument that a sales tax payment is not a thing of value, and held that sales taxes were includable in determining the aggregate value of the goods and services obtained in violation of the statute. *Id.* at 56. The court reasoned that "anything of value," includes sales tax because it has value to several entities, including the defendant, the bankcard company, and the taxing authorities. *Id.* This reasoning is apposite here. In Indiana, a purchaser must, as a prerequisite to obtaining goods or services, pay tax. Defendant's argument that he received nothing of value when he used the credit card to pay a tax prerequisite to receiving the goods defies common sense.

The fair market value of property is commonly defined as the price a willing buyer would pay a willing seller for the property, when neither is under compulsion to buy or sell. *See, e.g., United States v. Cartwright*, 411 U.S. 546, 550, 93 S.Ct. 1713, 1716, 36 L.Ed.2d 528 (1973) (valuing property for federal income, estate, and gift taxes); *United States v. Bakken*, 734 F.2d 1273, 1278 (7th Cir.1984) (calculating value of stolen goods); *United States v. Crown Equip. Corp.*, 86 F.3d 700, 707 (7th Cir.1996) (calculating contract damages) (interpreting Wisconsin law). In states that levy sales tax, buyers necessarily consider this mandatory amount in determining what they are willing to pay for an item. *See, e.g., United States v. Burns*, 894 F.2d 334, 336 (9th Cir.1990) (amount of loss,

where "loss" is defined as the "value of property taken, damaged or destroyed," includes sales tax and shipping charges because a willing buyer is prepared to pay those charges).

In addition, the proper definition of "value" under § 1644(a) is specifically informed by the purpose of the statute. A violator of § 1644(a) is defrauding the issuing credit card company, which bears the ultimate responsibility to pay the merchant the total amount charged, not merely the retail sticker price of the goods. Therefore, the appropriate meaning of "value" under a statute penalizing fraudulent credit card use is the amount out of which the credit card company was defrauded: the *total* amount charged to the card. We hold that sales tax is includable in calculating the aggregate value under 15 U.S.C. § 1644(a).[2]

## 2. Sufficiency of the Evidence

■ Draves next challenges the district court's denial of his motion for acquittal, insisting there was a "complete absence of evidence" that Draves shared Parmelee's criminal intent. Although our review of a denial of a motion for judgment of acquittal is *de novo, United States v. Sax*, 39 F.3d 1380, 1385 (7th Cir.1994), we review the entire record and accompanying inferences in the light most favorable to the government. *United States v. Briscoe*, 65 F.3d 576, 586 (7th Cir.1995). Under this deferential standard, we will reverse only if there is no evidence from which any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *United States v. Penson*, 896 F.2d 1087, 1093 (7th Cir.1990).

■ To establish that Draves aided and abetted Parmelee's fraudulent purchases, the government must prove beyond a reasonable doubt that Draves knew of the crime, intended to help it succeed, and provided some act of help. *See United States v. Carson*, 9 F.3d 576, 586 (7th Cir.1993). Draves does not

---

**2.** In 1974, Congress amended § 1644 to reduce the threshold aggregate value from $5,000 to $1,000, and to increase the maximum punishment for violation from 5 to 10 years. Pub.L. No. 93–495, 88 Stat. 1520. We note that our

holding today is in keeping with the amendment's goal of strengthening federal response to increased occurrence of credit card fraud. *See United States v. DeBiasi*, 712 F.2d 785, 791 n. 4 (2d Cir.1983).

deny that he was present during the first two fraudulent transactions, nor does he refute that he aided Parmelee by providing her with transportation. Instead, Draves challenges the jury's finding, and ultimately the district court's holding, that he had sufficient knowledge that the credit card was stolen.

Draves' principal argument is that the lack of direct evidence[3] and the weakness of the circumstantial evidence could not have led to a reasonable inference that he knew of Parmelee's illegal activity. Specifically, Draves argues that the government did not prove his actual knowledge beyond a reasonable doubt, but only offered evidence that suggests, at most, his negligent failure to know of the fraud.

Under Seventh Circuit law, Draves' knowledge of the activity did not have to be "actual" knowledge. Under the "conscious avoidance" or "ostrich" doctrine, knowledge may in some circumstances be inferred from strong suspicion of wrongdoing coupled with active indifference to the truth. Draves' jury was given this "ostrich instruction":

> Knowledge may be inferred from a combination of suspicion and indifference to the truth. If you find that the defendant had a strong suspicion that things were not what they seemed or that someone had withheld some important facts, yet shut his eyes for fear of what he would learn, you may conclude that he acted "knowingly" as I have used that word. You may not conclude that the defendant had knowledge if he was merely negligent in not discovering the truth.

This type of ostrich instruction is appropriately given when the defendant claims he had no guilty knowledge of the illegal activity yet the evidence supports an inference that defendant had a strong suspicion of

wrongdoing, yet made a deliberate effort to avoid guilty knowledge by "burying his head in the sand." *See United States v. Hoyos,* 3 F.3d 232, 237 (7th Cir.1993); *United States v. Gonzalez,* 933 F.2d 417, 434 (7th Cir.1991); *United States v. Talkington,* 875 F.2d 591, 596 (7th Cir.1989).

Despite the evidence of record, Draves insists that his conviction was based on evidence that could only support an inference of negligence, a basis which we have clearly disallowed.[4] *See United States v. Giovannetti,* 919 F.2d 1223 (7th Cir.1990). In *Giovannetti,* this Court evaluated the propriety of the "ostrich instruction" used by the jury to determine whether the defendant had guilty knowledge sufficient to support a charge of aiding and abetting a gambling operation. The defendant in *Giovannetti* had rented a house to two tenants who used the property for their illegal gambling operation. We found the instruction improper because defendant did not have a basis for a strong suspicion of shady dealings which he actively or consciously ignored. *Giovannetti,* 919 F.2d at 1228. The court held that the instruction should not be given if the prosecution has only presented evidence that "a reasonable man who knew what [the defendant] knew would have inquired further and discovered the illegal activity." *Giovannetti,* 919 F.2d at 1227–28. We concluded that the defendant's failure to display curiosity by not driving by the rented property and inquiring about its use was mere negligence, not the active avoidance that should trigger the ostrich doctrine.

Draves relies on *Giovannetti* to argue that the government proved no more than his negligent failure to recognize the fraud. Draves' sole basis for arguing negligence is that he lacked sufficient time to form suspi-

---

3. Draves' objection to the absence of direct evidence is of no moment. We clearly allow circumstantial evidence to support a jury's verdict, *United States v. Goines,* 988 F.2d 750, 758 (7th Cir.1993), and must "accept circumstantial evidence as support, even sole support, for a conviction." *United States v. Gonzalez,* 933 F.2d 417, 437 (7th Cir.1991).

4. Draves does not directly charge the district court with error in giving the conscious avoidance instruction. However, the propriety of the

instruction is indirectly asserted when he argues that the evidence of his intent only amounted to a negligent failure to know the card was stolen. The jury judged Draves' actions under the conscious avoidance standard of knowledge. We therefore address the propriety of the instruction and whether evidence was sufficient for a reasonable jury to infer, in accordance with that instruction, that Draves consciously avoided the truth.

cion and therefore to consciously avoid learning of the fraud. Viewing the evidence and attendant inferences in a light favorable to the government, this argument must fail. Draves' involvement with Parmelee was much closer to the action than that of the landlord to his tenants in *Giovannetti.* The record indicates that Draves first accompanied Parmelee to an ATM where she made repeated attempts in vain to enter the correct personal identification number of the victim's ATM card. The card was confiscated by the machine. Then, Draves drove Parmelee to at least two of the middle-of-the-night shopping sprees, allegedly waiting in the car during the first, and undeniably accompanying Parmelee through the checkout lane in the second. This second transaction, captured on store videotape, took some fifteen minutes to complete. On this evidence, the jury could reasonably infer that Draves had plenty of time to question the suspicious nature of the shopping sprees yet avoid the truth by waiting in the car (as he alleges he did) during the first purchase, and by "looking the other way" while Parmelee signed the charge slip during the second purchase. As we made clear in *Giovannetti,* a defendant's deliberate effort to avoid guilty knowledge "can be a mental, as well as a physical, effort—a cutting off of one's normal curiosity by an effort of will." *Id.* at 1229. Draves' conduct is precisely the type of "purely psychological avoidance" to which the ostrich doctrine's definition of knowledge was meant to apply.

Here, the government presented the following evidence: Draves had an intermittently cohabitational and sexual relationship with Parmelee, knew she was unemployed yet somehow had obtained a "gold" credit card, and knew Parmelee tried in vain that night to obtain money from an ATM. In spite of his knowledge of her financial situation, Draves drove Parmelee on several pre-dawn, high-ticket shopping sprees between two branches of the same store located ten miles apart. The urgent need for multiple trips to two branches of the same store in the middle of the night, even though the stores stocked the same mix of merchandise was, to say the least, suspicious. In addition, Draves was caught on video tape helping Parmelee

through the checkout lane with electronic equipment totaling over $700 during the second transaction. Draves was seen acting affectionately toward Parmelee during the fifteen minutes it took to process the credit card transaction. He stood next to Parmelee when she swiped the gold card through the credit card approval machine and forged the card holder's signature on the charge slip. The fraud was literally taking place before his very eyes.

In response to this evidence, Draves offers only his own profession of innocence and Parmelee's testimony that Draves did not know the card was stolen. The jury weighed the government's body of evidence, made credibility determinations about the appropriate weight to afford Parmelee's testimony, and concluded that Draves had sufficient knowledge of the illegal activity under the conscious avoidance standard. The court of appeals does not sit to reweigh evidence or speculate on the credibility of a witness. *United States v. Saunders,* 973 F.2d 1354, 1358 (7th Cir.1992).

Given Draves' close proximity to this transaction, his relationship with Parmelee, and the strange shopping pattern, it was reasonable for a jury to infer that Draves either actually knew or had strong suspicions of wrongdoing yet consciously avoided the possibility of fraud. In sum, we find that the evidence presented by the government was sufficient to support a reasonable jury inference that Draves' claimed ignorance of Parmelee's illegal actions "could only have resulted from his 'cutting off of [his] normal curiosity by an effort of will.'" *United States v. Gonzalez,* 933 F.2d 417, 436 (7th Cir.1991) (quoting *Giovannetti,* 919 F.2d at 1229). Because the jury's finding of guilt is not beyond the reasonable reach of the evidence presented, the district court properly denied the motion for acquittal.

### 3. Ineffective Assistance of Counsel

Draves' final challenge to his conviction is a charge that he was robbed of his Sixth Amendment right to effective assistance of counsel. In support, he points to the following omissions by trial counsel: 1) failure to

object to the government's improper character attacks on Parmelee in the opening statement and related failure to move for a mistrial; 2) failure to object to the "ostrich instruction" and related failure to proffer instead a "shared criminal intent" instruction; and 3) counsel's allegedly inadequate motion for acquittal.

 Draves brings his Sixth Amendment claim for the first time in our court. As a general rule, we refuse jurisdiction of an ineffective assistance claim unless the appellant raised the issue at trial, because the trial record typically does not provide us with sufficient evidence to rule on the claim. *See United States v. Syverson,* 90 F.3d 227 (7th Cir.1996); *United States v. Johnson–Wilder,* 29 F.3d 1100 (7th Cir.1994); *United States v. Lang,* 644 F.2d 1232 (7th Cir.1981). For this reason, ineffective assistance claims are best brought before the district court in a motion for new trial or collateral request for relief. *See United States v. Mojica,* 984 F.2d 1426, 1452 (7th Cir.1993). Although Draves did not technically present a Sixth Amendment argument to the district court, the argument was made for all practical purposes in his *pro se* motion for replacement of attorney, which he supported with his *pro se* version of a memorandum in support of his motion for a new trial. R. at 94–95.[5] This memorandum, and the district court's response, address some of the alleged inefficiencies we now consider. In addition, Draves' claims are based upon alleged ineffectiveness apparent from the trial record. *See United States v. Taglia,* 922 F.2d 413, 417 (7th Cir.1991). Thus, the record is sufficiently developed for us to consider (and ultimately reject) Draves' ineffective assistance claims.

 To prove ineffective assistance under the two-prong test enunciated by the Supreme Court in *Strickland v. Washington,* Draves must first show that his counsel's performance was unreasonably deficient. 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). In reviewing counsel's performance, the court of appeals must consider whether counsel's acts or omissions fell "outside the wide range of professionally competent assistance" such that defendant in effect received no assistance at all. *Strickland,* 466 U.S. at 690, 104 S.Ct. at 2066. Even if an appellant can bear the heavy burden of demonstrating this type of egregious deficiency, he must also show that but for the deficient performance the trial would have turned out differently. *Id.*

 Draves first challenges his counsel's response to alleged prosecutorial misconduct. In the opening statement, the prosecutor told the jury, "you will hear that [Parmelee] is a crack cocaine user, a heroine user, and she used prostitution to support her habits." The prosecution continued this attempt at character assassination during the trial. Draves insists that his trial counsel's failure to object to the initial character attack during opening statements, and subsequent failure to move for a mistrial based on this alleged misconduct, rendered her assistance ineffective. We disagree. Although Draves' counsel did not object during opening, the record displays her repeated objections during the course of the trial to similar character attacks made by the prosecution. Trial counsel's performance on the whole displays a diligence in responding to this line of argument that falls easily within the wide range of acceptable professional performance required by *Strickland.* Nor can Draves show prejudice. In its response to Draves' *pro se* motion for acquittal, the district court addressed this exact argument and found that the prosecutor's comments, while questionable, did not warrant a new trial.

 Draves then questions counsel's failure to object to the "ostrich instruction" given, and concomitant failure to proffer a "shared criminal intent" instruction. The district court found, and we agree, that the ostrich instruction was proper in this case. *See supra.* Draves' argument fails to show prejudice as required by *Strickland.* Trial

---

5. After Draves' trial counsel filed a Rule 29(c) motion for judgment of acquittal, Draves filed *pro se* motions to replace counsel and for acquittal or new trial. Although the district court properly struck the *pro se* motions for Draves'

failure to seek leave to act as his own attorney, the court nevertheless addressed and rejected all of Draves' arguments in its Memorandum and Order of January 25, 1996.

counsel did not prejudice Draves by failing to object to a properly given jury instruction. *See United States v. Allender*, 62 F.3d 909, 915 (7th Cir.1995); *United States v. Caldwell*, 625 F.2d 144, 149 (7th Cir.1980).

Neither does trial counsel's failure to proffer a "shared criminal intent"[6] instruction support Draves' claim of ineffective assistance. Draves suggests that because his proffered instruction was not given, the jury was left inadequately apprised of the mental state required for the crime, citing our decision in *United States v. Barclay*, 560 F.2d 812 (7th Cir.1977). But Draves' reliance on *Barclay* is misplaced because that district court gave essentially *no* instruction on intent. By contrast, the district court here gave the ostrich instruction and also instructed the jury that the defendant must have "knowingly associate[d] himself with the criminal venture, participate[d] in it, and tr[ied] to make it succeed." The court went on to define "knowingly" as requiring a defendant to have realized what he was doing and not merely to have "act[ed] through ignorance, mistake or accident." As Draves acknowledges in his brief, " 'knowledge' is the cornerstone of the 'intent' analysis" under 18 U.S.C. § 2. Read in full, the jury instructions given by the district court correctly define the mental state required to impose aider and abettor liability. Trial counsel did not prejudice Draves by refusing to proffer a specific instruction when legally sufficient instruction was given.

■■■ Finally, Draves challenges the adequacy of the motion for judgement of acquittal prepared by his attorney because the motion "was just two pages long and cited none of the ample case authority to support its conclusions." We view legal brevity with favor, not disdain. That said, however, a ruling on deficiency is unnecessary given the lack of prejudice. Because the evidence against Draves was sufficient for conviction, *see supra*, no prejudice would arise even if counsel had filed *no* motion for acquittal, *see United States v. Pedigo*, 12 F.3d 618, 623 (7th Cir.1993), let alone a motion merely lacking legal citation.

### 4. Government's Sentencing Challenge

■■■ The government challenges as error the district court's refusal to enhance Draves' base offense level for willfully obstructing justice by running from the arresting officers. We disagree and hold that, under these facts, rejecting an obstruction enhancement was not improper.

Under the Sentencing Guidelines, the sentencing judge may impose a two-level enhancement if the defendant "willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation, prosecution, or sentencing of the instant offense." U.S.S.G. § 3C1.1. The commentary to this section further assists the court by providing examples of conduct that respectively do and do not warrant application of a § 3C1.1 enhancement. Specifically, Application Note 3 provides a list of examples of conduct that warrant enhancement, including "escaping or attempting to escape from custody before trial or sentencing." U.S.S.G. § 3C1.1, comment (n. 3(e)). Application Note 4 provides a list of examples of conduct that *do not* warrant enhancement, including "avoiding or fleeing from arrest."[7] U.S.S.G. § 3C1.1, comment (n. 4(d)).

When the U.S. Postal Inspection Service officers arrived at Draves' home to execute arrest warrants for Draves and Parmelee, the officers found Draves first, informed him of the charges against him, handcuffed him,

---

**6.** Draves offers the following as the proper instruction: The elements of aiding and abetting include: "association" and "participation". To prove "association", *there must be evidence to establish that the defendant shared in the criminal intent of [the principal].* "Participation" requires evidence to establish that the defendant engaged in some affirmative conduct designed to aid in the success of the criminal venture. The government must prove these elements beyond a reasonable doubt. (emphasis in original).

**7.** If the defendant's flight from arrest, however, "recklessly created a substantial risk of death or serious bodily injury to another person," a two-level enhancement is warranted under U.S.S.G. § 3C1.2. These circumstances were not present here.

and placed him in the back seat of their car.[8] Both officers then left Draves to execute Parmelee's warrant. While the officers were attending to Parmelee, Draves seized his opportunity to flee from the arresting officers on foot. Draves was apprehended a mere three houses away from the scene of arrest.

The district court denied an obstruction enhancement on these facts, finding that "for all practical purposes when Mr. Draves fled this arrest was still in progress." The court reasoned that just because Draves fled "after his formal arrest when the opportunity arose," his conduct was not transformed into the type of willful "escaping or attempting to escape from custody" sufficient for an enhancement. We review the sentencing court's factual determinations regarding obstruction of justice for clear error, but review interpretations of the Sentencing Guidelines *de novo*. *United States v. Jones*, 983 F.2d 1425, 1429 (7th Cir.1993). In our review, we give "due deference to the district court's application of the guidelines to the facts." 18 U.S.C. § 3742(e); *see also United States v. Ramacci*, 15 F.3d 75, 77 (7th Cir. 1994). A sentencing court's decision on whether a defendant obstructed justice under § 3C1.1 is a finding of fact, which we uphold unless clearly erroneous. *United States v. Robinzine*, 80 F.3d 246 (7th Cir.1996); *United States v. Wright*, 37 F.3d 358, 361 (1994).

Obstruction of justice cases distinguish panicked, instinctive flight from calculated evasion. Compare *United States v. Hagan*, 913 F.2d 1278 (7th Cir.1990) (obstruction increase improper because defendant's flight was "the instinctive flight of a criminal about to be caught by the law"), with *United States v. Mondello*, 927 F.2d 1463, 1466–67 (9th Cir.1991) (defendant's conduct was not mere flight where he "for two weeks prior to his final arrest played a cat-and-mouse game of

avoiding the authorities"). *See also United States v. Walcott*, 61 F.3d 635, 639 (8th Cir. 1995) (defendant's conduct not "instinctive fleeing" where he "deliberately engaged in conduct over a considerable amount of time calculated to mislead and deceive authorities" such as changing his residence and using an alias and physical disguise).[9] Here, the record indicates that Draves was panicked by the arrival of the officers, and when the opportunity arose during the arrest, spontaneously and without deliberation fled the car on foot. In short, Draves' conduct had not, "due to its duration or acts occurring in the course thereof, ripen[ed] into a willful attempt to impede or obstruct the administration of justice." *Mondello*, 927 F.2d at 1466 (quoting *United States v. Stroud*, 893 F.2d 504, 508 (2d Cir.1990)) (internal quotations omitted).

The government argues that because Draves was clearly in custody in the back of the car, Application Note 3 required the judge to impose an obstruction enhancement. In making this argument, the government sidesteps the teachings of the "flight" cases, in essence asking us to find that because Draves was formally "in custody," we should ignore the possible characterization of the defendant's conduct as mere flight under Application Note 4. Under this line of reasoning, all evasive actions taken at the scene of arrest by a defendant after his handcuffs are in place (or after he is otherwise formally in custody) must constitute "escape from custody" rather than "flight from arrest." We reject this overly formalistic argument. It is not at all clear to this Court that these two categories of conduct are mutually exclusive, requiring a judge to fit defendant's conduct into either "escape from custody" or "flight from arrest." The government cites no case, and we could find none, that supports this alleged requirement.

---

**8.** The parties dispute whether Draves had been Mirandized at this point.

**9.** Prior to November 1, 1990, the commentary to § 3C1.1 gave only an exemplary list of conduct which *would* warrant application of an obstruction enhancement (comparable to the list now given in Application Note 3). On this effective date, however, the commentary to § 3C1.1 was amended to also include a non-exhaustive list of actions which *would not* warrant application of

an obstruction enhancement, including "avoiding or fleeing from arrest." See U.S. Sentencing Comm'n, Guidelines Manual app. C, at C.193 (Nov.1990). Many of the "flight" cases cited in this opinion were decided before this amendment. However, because Application Note 4(d) restates these cases' holdings that "mere flight" alone is not grounds for an enhancement, their reasoning is instructive.

We prefer a less myopic analysis of defendant's conduct that considers all of the relevant Application Notes together with the language and purpose of the Guideline. Circumstances may arise, as they have here, where formal custody is present, yet the defendant's action is best viewed as the "instinctive flight of a suspect who suddenly finds himself in the power of the police," *Garcia,* 909 F.2d 389, 392 (9th Cir.1990) rather than deliberate conduct "calculated to mislead and deceive authorities." *Walcott,* 61 F.3d at 639. Thus, given the possible overlap of Application Notes 3 and 4, judicial consideration of the purpose of the guideline is appropriate. In this case, the plain language of the Guideline states that only willful activities warrant enhancement for obstruction. We are mindful of the Supreme Court's ruling that Application Notes are binding unless they violate the constitution or a statute. *Stinson v. United States,* 508 U.S. 36, 113 S.Ct. 1913, 123 L.Ed.2d 598 (1993). Our decision today is consistent with that holding, because the Application Notes here at issue specifically state that the lists of conduct are nonexhaustive, and are merely intended to "assist the court in determining whether application of this enhancement is warranted in a particular case." U.S.S.G. § 3C1.1, comment (n. 2); *see also United States v. Madera-Gallegos,* 945 F.2d 264, 266 (9th Cir.1991).

Neither party cited, and we are unaware of, another case presenting this unusual set of factual circumstances which brings both Application Notes 3 and 4 into play. Nevertheless, when a defendant runs from arresting officers, we believe the proper yardstick for a § 3C1.1 enhancement is whether defendant's departure from the scene of arrest was spontaneous or calculated. This distinction has been the basis of rulings on willful obstruction both in the immediate aftermath of crime, *Stroud,* 893 F.2d at 508, and upon presentation of warrants for arrest after the crime has occurred. *Walcott,* 61 F.3d at 639. We see no reason why the same reasoning would not apply merely because Draves' arrest process was a bit further along.

The clear requirement of § 3C1.1, that an obstruction enhancement be imposed only for conscious, *willful* obstruction, cannot be ignored. *See Stroud,* 893 F.2d at 506. The ultimate question under this section, then, is whether the defendant's conduct evidences a willful intent to obstruct justice. We defer to the district court's factual finding that the arrest process was not complete, and agree that Draves' conduct, quite unlike the defendants' clearly calculated actions in *Walcott* and *Mondello,* is properly characterized as spontaneous, instinctive flight from the arresting officers, void of the willfulness required for an obstruction of justice enhancement.

The district court's judgment is AFFIRMED.