

**FILED**

Feb 16 2016, 8:40 am

CLERK
of the supreme court,
court of appeals and
tax court

| | |
|---|---|
| ATTORNEY FOR APPELLANT | ATTORNEYS FOR APPELLEE |
| R. Patrick Magrath | Gregory F. Zoeller |
| Alcorn Sage Schwartz & Magrath, LLP | Attorney General of Indiana |
| Madison, Indiana | |
| | Angela N. Sanchez |
| | Deputy Attorney General |
| | Indianapolis, Indiana |

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Gary L. Mefford, | February 16, 2016 |
| *Appellant-Defendant,* | Court of Appeals Case No. 40A01-1504-CR-147 |
| v. | Appeal from the Jennings Circuit Court |
| State of Indiana, | The Honorable Jon W. Webster |
| *Appellee-Plaintiff.* | Trial Court Cause No. 40C01-0907-FD-257 |

**Najam, Judge.**

# Statement of the Case

Gary L. Mefford appeals his convictions following a bench trial for three counts of theft, as Class D felonies. He raises the following two issues on appeal.

1. Whether the trial court erred in denying his motion for discharge pursuant to Indiana Criminal Rule 4(C).

2. Whether there was sufficient evidence to support his conviction for theft.

We affirm.

# Facts and Procedural History

In early 2006, Mefford, who owned a logging and timber business known as Gary Mefford Logging ("the business"), entered into contracts with three landowners in Jennings County to cut timber from their property and split the gross proceeds from the sale of the timber with each of them fifty-fifty. Pursuant to his contract to remove timber from Elizabeth Steeb's property, Mefford and his employees began cutting and removing the timber in July 2006. Mefford and his employees loaded the cut timber onto trucks and, from there, Mefford's employees Tina Rowlett and Christine Boldery sold the timber to one of two lumber mills. Payment for each truckload of timber was made by cash or check to Rowlett or Boldery. With the exception of one check in the amount of $4,566.12 that was paid directly to Mefford for some of the Steeb timber, payment was not made directly to Mefford, and checks were not written to Mefford or his company. Over a period of four weeks, the Steeb timber sold

for a total of $51,274. However, Rowlett gave Mefford about $26,000 for that timber. Mefford testified that he gave Steeb four payments totaling $13,000.

[4] In October 2006, Mefford entered into a contract with Heather and Jeremy Kessler to remove timber from their property. At around the same time, Mefford also entered into a contract with Joyce Cherry, whose property adjoined the Kesslers' property, to remove timber from her property. Under both the Kessler and Cherry contracts, Mefford agreed to split the gross proceeds from the sale of the timber fifty-fifty with each landowner. In October, Mefford and his employees began cutting and removing the trees from the Kessler and Cherry properties. Rowlett sold the timber from those two properties for a total of $9,000, but she gave Mefford only $4,000 of those proceeds. Mefford paid Kessler and Cherry $2000 total for the timber harvested from their respective properties. Mefford made no other payments to Kessler or Cherry.

[5] In 2007, Steeb, Kessler, and Cherry filed complaints with the Indiana Department of Natural Resources ("DNR") because they were not convinced that they had received all the money to which they were entitled for the sale of timber Mefford had harvested on their properties. Following an investigation by DNR, on July 17, 2009, the State charged Mefford with three counts of theft as Class D felonies, one count for each of the landowners. On July 30, 2009, Mefford was arrested. He subsequently posted bond and was released from jail.

[6]     On September 30, 2009, the trial court set a three-day jury trial to begin on July 12, 2010. On June 25, Mefford moved to continue the trial date. The trial court granted that motion and reset the jury trial to begin on February 1, 2011. Between January 14, 2011, and July 15, 2013, Mefford requested and was granted four additional continuances of the trial. During that time he also waived his right to a jury trial.

[7]     On August 19, 2013, the State moved to continue the September 12, 2013, trial. The State's motion for continuance indicated that Mefford was informed of the motion and had no objection to the continuance. The trial court reset the trial for November 5, 2013. Between October 31, 2013, and April 19, 2014, the State requested three additional continuances, all of which indicated that Mefford was informed of the motions and had no objections to the continuances, and all of which were granted. On July 24, 2014, Mefford again moved to continue the trial because he was still conducting discovery, and the trial court reset the trial for October 28, 2014. On October 28, 2014, the trial court continued the trial due to court congestion resulting from a jury trial in another case. The court reset Mefford's trial for February 9, 2015. On February 2, 2015, Mefford moved to continue the February 9 trial date, but the trial court denied his motion. On February 9, Mefford filed a motion to dismiss and discharge his case pursuant to Indiana Criminal Rule 4(C). The trial court took the motion under advisement and proceeded with the February 9 bench trial.

[8] At trial, the State presented testimony from Rowlett, Mefford's employee, who, along with Boldery, was responsible for most of the loading and hauling of the timber harvested from all three properties to the lumber yards where the timber was sold. Mefford assisted with loading on occasion, but he usually just cut the timber. Rowlett testified that, while she and Mefford were removing timber from the Kessler and Cherry properties, Mefford had mixed together the logs taken from each property without marking them, which made it impossible to identify which logs had come from which property. She also testified that she had kept no records from the Kessler and Cherry timber sales. Nonetheless, she testified that the Kessler timber had sold for approximately $5,100 and the Cherry timber had sold for approximately $4,800. Checks for the Kessler and Cherry timber were made payable to Rowlett so that she could cash the checks and then pay herself and the other employees who had worked on the jobs. Rowlett did not testify as to how much of the money from the Kessler and Cherry timber sales she had given to Mefford.

[9] Rowlett testified that she had received a total of $51,274 for the timber harvested at the Steeb property, but she did not testify that Mefford ever knew she had received that amount. Rowlett testified that, with each timber sale on the Steeb job, she had received a check, receipt, or other documentation of the sale from the respective mills. Rowlett also testified that State's Exhibit 5 consisted of her own hand-written notes regarding the checks she had received from the lumber companies for the Steeb timber. She further testified that some of the receipts and other documents relevant to the Steeb contract were

contained in State's Exhibit 6.[1]  But there is no evidence that Mefford had ever seen any such paperwork prior to the criminal charges against him,[2] and there is no evidence that Mefford otherwise knew that Rowlett had received a total of $51,274 for the timber sold from the Steeb property.

[10]  At the conclusion of Rowlett's testimony, she was taken into custody on an outstanding warrant for her arrest for violating probation.  Immediately prior to being taken into custody, Rowlett testified that she was on probation for a theft conviction related to timber she had removed from someone's property in Henryville in 2013.

[11]  The State also presented testimony from John Cannarello, an investigator with the DNR's Law Enforcement Division who investigated the landowners' complaints against Mefford.  Cannarello testified that, in his experience, "50/50" as used in Mefford's contracts with the landowners means that "the timber buyer agrees to pay the landowner 50% of whatever he gets paid for the timber from the log yard, the logging companies."  Tr. at 6.

[12]  The State also presented testimony and affidavits from Dewayne Allen McCoy, a forester with DNR's Division of Forestry.  McCoy is trained to evaluate

---

[1] This exhibit consisted of "reports" from Baxter Lumber and four "receipts" from Amos-Hill & Associates. State's Ex. 6.  None of the documents in Exhibit 6 make reference to the Steeb property or any other property in Jennings County.  In fact, the only four pages of Exhibit 6 that are actually receipts indicate that the timber sold came from Johnson County.

[2] Mefford testified that the first time he saw any of the records Rowlett kept on the three contracts was in the Prosecutor's office prior to trial.  Tr. at 104.

stump and branch refuse to assess the value of removed timber. McCoy was asked by DNR conservation officers to investigate the timber taken from the three Jennings County properties at issue in this case. McCoy did so for the Steeb property in November 2007 and January 2008, and he concluded that the assessed value of the timber removed from that property was $46,404.28. In December 2006 and January 2007, McCoy investigated the Kessler and Cherry properties and concluded that the assessed value of the timber removed from both properties combined was $16,705.45.

[13] By the time of the trial, Steeb had died. However, her daughter, Ruth Long, testified at trial that her mother had a contract with Mefford under which her mother was to receive fifty percent "from the sale of the lumber." Tr. at 12. Ms. Long also testified that, in the Fall of 2006, Mefford had gone to the Steeb home and asked Long if she had contacted the DNR to lodge a complaint against him. Long testified that she had told Mefford she had not contacted the DNR, and Mefford had then made a $2,000 payment to Steeb. Long testified that Mefford promised to provide the Steeb family with documentation showing what timber had been removed from the property, but he never did. Long did not know whether Mefford had made any payments to Steeb other than the $2,000 payment.

[14] Heather Kessler also testified for the State. She testified that, under her contract with Mefford, she was to receive fifty percent of "whatever . . . he earned from selling the logs." Tr. at 43. She also testified that, sometime in November 2006, she had confronted Mefford about payment for the timber he had taken

and Mefford had promised to write her a check. However, when they had reached Mefford's house, he had not written Kessler a check and he had instead, for reasons unexplained, threatened to call the police about her. Kessler testified that, sometime before November 4, 2006, Mefford had paid her $1,000 in cash for the timber he had taken from her property.

[15] The State also presented the testimony of Joyce Cherry. She testified that her contract with Mefford provided for a "50/50 split on the wood." Tr. at 29. She also testified that, when the contract was signed, she had expressed fear to Mefford that she would get a bad deal, which had happened to her before. She stated that Mefford had "basically" replied to her, "if I wanted to screw you over I could screw you over [and] this piece of paper wouldn't mean a thing." Tr. at 30. Cherry stated that Mefford had paid her $1,000 for the timber he had taken from her property.

[16] Mefford testified he had been in the "logging and timber business" for more than ten years. Tr. at 94. He stated that he had never intended to deprive Steeb, Kessler, or Cherry of any value under the contracts, and he stated that he had paid each of them half of the money he had received from the timber taken from their properties. Mefford testified he had never seen the receipts for the sale of the timber before criminal charges had been brought against him, and that he had kept no records regarding timber transactions because Rowlett had "kept everything." *Id*. at 96. He also testified that he had not taken the timber to the mills because Rowlett and Boldery had done that. He stated that he had "no clue how many logs" were sold from the three Jennings County properties.

*Id.* at 97. Mefford testified that Rowlett gave him about $26,000 for the Steeb timber, which is why he had paid Steeb a total of $13,000 (i.e., half of what Rowlett had paid him) in cash over the course of four payments. Mefford also testified that he had given Kessler and Cherry $1,000 each, which totaled half of the approximately $4,000 Rowlett had paid him for both of their jobs. Mefford testified that he had never received more than about $26,000 for the Steeb job and approximately $4,000 combined for the Kessler and Cherry jobs. He stated that he had not provided the Jennings County landowners with receipts because Rowlett had not given him any receipts. Mefford testified that, although he was not aware of any additional money owed to the landowners, if it was proven that he did owe the landowners more money, he would pay it.[3]

[17] At the conclusion of the trial on February 9, 2015, the trial court issued its ruling from the bench denying Mefford's motion to dismiss and discharge and finding him guilty on all three counts of theft. The trial court stated from the bench that, because of the large discrepancy between what Mefford had paid to the landowners and what he had "actually received, or should have received, because [he was] the owner," for the timber he had taken from them, Mefford had not merely been mistaken or acted in good faith. *Id.* at 121. The trial court

---

[3] Mefford testified as follows on direct examination:

> Q: Gary, is it correct that we have always taken the position in this case that if you do owe any money . . .
>
> A: I would pay it.

Tr. at 100. He also admits on appeal that "there appears to be sufficient evidence that Mefford did not pay all of the amounts due under the contract." Appellant's Br. at 10.

also stated that Mefford's claims that he had no records of any of the sales of the landowners' timber or knowledge of the amount of the sales were "incredibly dubious." *Id*. at 121. On February 10, the trial court issued its written judgment, although it made no special findings. Following a sentencing hearing on April 6, 2015, the trial court sentenced Mefford to an aggregate sentence of eighteen months executed and twenty-one months suspended. This appeal followed.

## Discussion and Decision

### *Issue One: Discharge Under Indiana Criminal Rule 4(C)*

[18] Mefford argues that the trial court erred in denying his pre-trial motion for discharge under Indiana Criminal Rule 4(C). That rule provides that

> [n]o person shall be held on recognizance or otherwise to answer a criminal charge for a period in aggregate embracing more than one year from the date the criminal charge against such defendant is filed, or from the date of his arrest on such charge, whichever is later; except where a continuance was had on his motion, or the delay was caused by his act, or where there was not sufficient time to try him during such period because of congestion of the court calendar; provided, however, that in the last-mentioned circumstance, the prosecuting attorney shall file a timely motion for continuance as under subdivision (A) of this rule. Provided further, that a trial court may take note of congestion or an emergency without the necessity of a motion, and upon so finding may order a continuance. Any continuance granted due to a congested calendar or emergency shall be reduced to an order, which order shall also set the case for trial within a reasonable time. Any defendant so held shall, on motion, be discharged.

Ind. Criminal Rule 4(C). In reviewing Criminal Rule 4 claims, we review questions of law de novo, and we review factual findings under the clearly erroneous standard. *Austin v. State*, 997 N.E.2d 1027, 1039 n.8, 1039-40 (Ind. 2013).

[19] Under Criminal Rule 4(C), it was the duty of the State to bring Mefford to trial within one year from the date he was arrested, i.e., July 30, 2009.[4] *Todisco v. State*, 965 N.E.2d 753, 755 (Ind. Ct. App. 2012), *trans. denied*. However, when a defendant seeks a continuance, the time between his motion for a continuance and the new trial date is excluded from the one-year time limit. *Id.* Similarly, if the defendant acquiesces in a delay, such as not objecting to a continuance requested by the State, the one-year time limit is extended by the length of such delay. *Id.*

> Moreover, a defendant waives his right to a speedy trial if he is aware or should be aware of the fact that the trial court has set a trial date beyond the applicable time limitation, and he does not object to the trial date. [*State v. Black*, 947 N.E.2d 503, 507 (Ind. Ct. App. 2011).] As such, it is the defendant's "obligation to object at the earliest opportunity so the court can reset the trial for a date within the proper period. Failure to voice a prompt objection is deemed a waiver of the issue." *Hood v. State*, 561 N.E.2d 494, 496 (Ind. 1990).

---

[4] Under Indiana Criminal Rule 4(C), the date from which the one-year limit begins to run is the latter of the date on which charges are filed or the defendant is arrested.

*Id.* In addition, continuances due to court congestion or emergency do not count toward the Criminal Rule 4(C) period. *Curtis v. State*, 948 N.E.2d 1143, 1151 (Ind. 2011).

Here, the trial court initially set the trial date for July 12, 2010, which was within one year of the date Mefford was arrested. However, Mefford himself requested that that trial date be continued, and he subsequently filed six additional requests to continue the trial, all but the last of which were granted. And Mefford's counsel did not object to any of the State's four requests to continue the trial date. Thus, Mefford either sought or acquiesced to each and every continuance of his trial.[5] Therefore, all of the time attributable to those continuances is excluded from the one-year time limit imposed by the rule. *Todisco*, 965 N.E.2d at 755. Since the initial trial date was within the one-year time limit, and all of the delays must be excluded from that time limit, Mefford's trial date was timely under Indiana Criminal Rule 4(C). We affirm the trial court's denial of Mefford's motion for discharge.

### Issue Two: Sufficiency of the Evidence

Mefford contends that the evidence is insufficient to support any of his three theft convictions. Our standard of review in a sufficiency of the evidence claim is clear:

---

[5] Mefford also failed to object to the court's continuances due to court congestion, but such continuances do not court toward the one year time limit in any case. *Curtis*, 948 N.E.2d at 1151.

> [W]e examine only the probative evidence and reasonable inferences that support the [judgment]. We do not assess witness credibility, nor do we reweigh the evidence to determine if it was sufficient to support a conviction. Under our appellate system, those roles are reserved for the finder of fact. Instead, we consider only the evidence most favorable to the trial court ruling and affirm the conviction unless no reasonable fact-finder could find the elements of the crime proven beyond a reasonable doubt.

*Pillow v. State*, 986 N.E.2d 343, 344 (Ind. Ct. App. 2013) (citations and quotation marks omitted).

Pursuant to Indiana Code Section 35-43-4-2 (2009), to prove Mefford committed the three counts of theft, the State was required to show that he knowingly or intentionally exerted unauthorized control over each of the landowners' gross proceeds from the timber sales, with the intent to deprive the landowners of the value or use of those proceeds. The term "exert control over" property of another person means to "obtain, take, carry, drive, lead away, conceal, abandon, sell, convey, encumber, or possess property or to secure, transfer, or extend a right to property." Ind. Code § 35-43-4-1(a) (2009). And control is "unauthorized" under the statute

> if it is exerted in a manner or to an extent other than that to which the other person has consented; if it is exerted by creating or confirming a false impression in the other person; or if it is exerted by promising performance that the person knows will not be performed. I.C. 35-43-4-1(b)(2), (4), & (6).

*Dix v. State*, 639 N.E.2d 363, 368 (Ind. Ct. App. 1994), *trans. denied*.

[23] Mefford asserts on appeal that the State did not demonstrate either that he exerted control over the landowners' additional proceeds or that he had the intent to deprive the landowners of those proceeds. The elements of both "exertion of control" and intent can be proven by direct evidence or inferred from circumstantial evidence. *See, e.g.*, *Erkins v. State*, 13 N.E.3d 400, 407 (Ind. 2014) (regarding evidence of intent); *K.F. v. State*, 961 N.E.2d 501, 508 (Ind. Ct. App. 2012) (regarding evidence of exertion of control), *trans. denied*. And, to prove the defendant exerted unauthorized control, the State need not prove he had actual, physical possession. As our supreme court has long held, within the context of the theft statute,

> 'control' means . . . power or authority to check or restrain; regulating power; restraining or directing influence . . . so to[o] it may imply, or not imply[,] possession, depending on the circumstances . . . .

> * * *

> Our conclusion based on a meticulous examination of the meanings of these two words ["control" and "possession"] is this: that *to prove control over a chattel or over other property, one does not need in all cases to show conduct which amounts to possession.* Although control is a necessary element in proving possession, the converse is not true. Our analysis is supported by the wording of the statute . . . which states that the definition of 'exert control over property' includes but is not limited to possession.

*Williams v. State*, 253 Ind. 316, 322, 253 N.E.2d 242, 246 (1969) (emphasis added) (internal citations and quotations omitted).

[24] Although Mefford argues that he fulfilled his obligations to the landowners by paying them half of what he had received from Rowlett for the timber sales, his contracts with the landowners provided that they had sold their timber to Mefford "for the sum of 50/50 cash in hand." State's Ex. 3 and 4. And there was ample witness testimony, and no testimony otherwise, that the term "50/50 cash in hand" meant that Mefford was to provide the landowners with half of the total amount of money paid by the lumber yards for the sale of the timber, that is, the gross proceeds.[6] Yet, both Rowlett and Mefford testified that Mefford had instructed Rowlett to cash the checks given to her by the lumber companies, to pay Mefford's employees, and then to give Mefford the rest, which he claims to have split in half with the landowners.

[25] At most, then, Mefford paid the landowners only half of the net proceeds rather than half of the gross, contrary to the contracts. Thus, Mefford knew there was additional money owed but not paid to the landowners, namely, their half of the money paid to his employees out of the gross sales, and he exerted unauthorized control over that money by instructing Rowlett to distribute it to his employees. *Williams*, 253 N.E.2d at 246. There is sufficient evidence that Mefford agreed to pay the landowners 50% of the gross proceeds but knew that

---

[6] All three landowners testified that that was their understanding of the contract, and expert witness John Cannarello of the DNR testified that, in his experience, "50/50" means that "the timber buyer agrees to pay the landowner 50% of whatever he gets paid for the timber from the log yard, the logging companies." Tr. at 6.

he had given them at most 50% of the net proceeds.  Thus, his control over the money was "unauthorized."  *Dix*, 639 N.E.2d at 368.

[26]    Mefford acknowledges on appeal that the evidence was sufficient to show more money is owed to the landowners under the contracts.  But he argues that he never knew or possessed the full amount of the gross timber sales and, therefore, he could not have exerted unauthorized control over the money.  First, Mefford's argument ignores the fact that he instructed Rowlett to pay his employees out of the gross timber sales.  It is not necessary that the State prove Mefford knew the exact amount of the gross proceeds; what matters is that Mefford knew that the amount he received from Rowlett was net of his labor costs and, therefore, was not the gross proceeds.  Mefford was not engaged in a joint venture with the landowners in which they agreed to share the cost of labor.  Thus, according to his own testimony, Mefford knew he had not split the gross proceeds evenly with the landowners.

[27]    Second, Mefford's argument misunderstands the law relating to "control" versus "possession."  He testified that he "didn't get the [additional] money," and that, "[w]hat [he] got paid they got half of," Tr. at 106, 109, as if his lack of physical possession proved that he never "exerted control" over any other money.  However, it was not necessary for the State to prove that Mefford had physical possession of the gross proceeds; it was sufficient to prove that he had authority to, and that he did, direct how the gross proceeds would be used.  This is sufficient to show both that he exerted control over the gross proceeds

and that he intended to deprive the landowners of their fifty percent share of those proceeds. *Williams*, 253 N.E.2d at 246.

*Willful Ignorance*

The evidence also supports a reasonable inference that, apart from his labor costs, Mefford had good reason to suspect that the gross timber sales were greater than the amount he had received from Rowlett but that he purposefully chose not to take steps to confirm that suspicion. Mefford denied knowledge and claimed ignorance and, as such, presented a plausible deniability or "I know nothing" defense in an attempt to distance himself from responsibility for his own transactions. This has been described as the "Sergeant Schultz defense," under which a criminal or civil defendant asserts "that he or she was not an active participant in an alleged scheme or conspiracy, and that he or she knew nothing, saw nothing, and heard nothing." Black's Law Dictionary, 1574 (10th ed. 2014) (referring to a character from the television series Hogan's Heroes). But the trial court concluded that, "it is most incredibly dubious that you have no records and this lady [Rowlett] was handling all this money and you knew nothing about it." Tr. at 121. Thus, the court concluded either that Mefford did not testify truthfully or that he was willfully indifferent to the truth or both.

Writing for the Seventh Circuit, Judge Eschbach explained that, under the "conscious avoidance" doctrine, the knowledge element of a crime "may in some circumstances be inferred from strong suspicion of wrongdoing coupled

with active indifference to the truth." *United States v. Draves*, 103 F.3d 1328, 1333 (7th Cir. 1997). The doctrine applies "when the defendant claims he has no guilty knowledge of the illegal activity yet the evidence supports an inference that defendant had a strong suspicion of wrongdoing, yet made a deliberate effort to avoid guilty knowledge by 'burying his head in the sand.'" *Id.* (citations omitted). The United States Supreme Court, all federal courts of appeals, and approximately a dozen states have endorsed some version of this doctrine, also known as the "willful ignorance," "willful blindness," "deliberate avoidance," "deliberate ignorance," and "ostrich" doctrine. Alexander F. Sarch, Willful Ignorance, Culpability, and the Criminal Law, 88 St. John's L. Rev. 1023, 1023-24 (2014) (summarizing federal case law on the willful ignorance doctrine in criminal cases).

[30]   In *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 131 S. Ct. 2060, 2068-69, 2070-71 (2011) (footnote omitted), the United States Supreme Court explained the doctrine as follows:

> The doctrine of willful blindness is well established in criminal law. Many criminal statutes require proof that a defendant acted knowingly or willfully, and courts applying the doctrine of willful blindness hold that defendants cannot escape the reach of these statutes by deliberately shielding themselves from clear evidence of critical facts that are strongly suggested by the circumstances. The traditional rationale for this doctrine is that defendants who behave in this manner are just as culpable as those who have actual knowledge. Edwards, The Criminal Degrees of Knowledge, 17 Mod. L.Rev. 294, 302 (1954) (hereinafter Edwards) (observing on the basis of English authorities that "up to the present day, no real doubt has been cast on the proposition

that [willful blindness] is as culpable as actual knowledge"). It is also said that persons who know enough to blind themselves to direct proof of critical facts in effect have actual knowledge of those facts. *See United States v. Jewell*, 532 F.2d 697, 700 (C.A.9 1976) (en banc).

* * *

While the Courts of Appeals articulate the doctrine of willful blindness in slightly different ways, all appear to agree on two basic requirements: (1) the defendant must subjectively believe that there is a high probability that a fact exists and (2) the defendant must take deliberate actions to avoid learning of that fact.

Here, Mefford testified that he directed his employee, Rowlett, to handle the sales of the timber and all of the records of those sales. He stated that he did not know how much the lumber companies had paid Rowlett for the timber, and he took no steps to find out. Although he stated that he did ask Rowlett once for copies of the receipts, she did not provide them and he made no additional effort to obtain them from her. And Mefford never attempted to obtain records of the sales from the lumber companies, claiming he did not know which lumber companies to contact. Yet Mefford admitted that he had been in the "timber and logging business" for over ten years. Tr. at 94. He also testified that he was the person who cut or supervised the cutting of all the timber from the three landowners' property. Thus, it is reasonable to conclude that he knew approximately how much timber was cut. And the expert witness, McCoy, testified that the fair market value for the amount of timber

that was cut from the landowners' properties was far in excess of what Mefford said Rowlett had paid him for the timber.

[32] It was reasonable for the trial court to infer from this evidence that Mefford "subjectively believed that there was a high probability" that the timber sold for more than the amount Rowlett had paid to him, but he deliberately avoided learning of that fact. *Global-Tech*, 131 S. Ct. at 2068-71. As in *Draves*, Mefford's "claimed ignorance . . . could only have resulted from his cutting off of his normal curiosity by an effort of will." *Draves*, 103 F.3d at 1334 (quotations and citations omitted). Thus, even if Mefford did not know the precise amount of the timber sales, he was willfully ignorant of the amount. Under the conscious avoidance doctrine, his willful ignorance was sufficient to satisfy the knowledge element of theft. *Id.* at 1333. The evidence supports the Prosecuting Attorney's statement in closing argument that, "[Mefford] never intended to pay [the landowners] based on the fact that he just kept putting everybody off." Tr. at 118. And, as noted above, Mefford was the person directing how the gross timber sales proceeds were to be distributed. There is, therefore, sufficient evidence of Mefford's willful ignorance and that he exerted unauthorized control over the additional money that was the property of the landowners. *Williams*, 253 N.E.2d at 246.

[33] In sum, the trial court did not err in denying Mefford's motion for discharge under Indiana Criminal Rule 4(C), and there was sufficient evidence to support Mefford's three theft convictions.

[34]    Affirmed.

Riley, J., and May, J., concur.