**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.                                                          No. 96-4162

MICHAEL CRANDALE WILLIAMS,
Defendant-Appellant.

Appeal from the United States District Court
for the Eastern District of North Carolina, at Elizabeth City.
Malcolm J. Howard, District Judge.
(CR-95-9-H)

Argued: March 5, 1998

Decided: July 30, 1998

Before MICHAEL and MOTZ, Circuit Judges, and
PHILLIPS, Senior Circuit Judge.

_____

Affirmed in part, reversed in part and remanded by published opinion.
Senior Judge Phillips wrote the opinion, in which Judge Michael and
Judge Motz joined.

_____

**COUNSEL**

**ARGUED:** Fred Warren Bennett, Associate Professor of Law,
CATHOLIC UNIVERSITY LAW SCHOOL, Washington, D.C., for
Appellant. Anne Margaret Hayes, Assistant United States Attorney,
Raleigh, North Carolina, for Appellee. **ON BRIEF:** Janice McKenzie
Cole, United States Attorney, J. Benjamin Davis, Third Year Law

Student, YALE LAW SCHOOL, Miguel Hull, Third Year Law Student, UNIVERSITY OF NORTH CAROLINA SCHOOL OF LAW, Raleigh, North Carolina, for Appellee.

_____

**OPINION**

PHILLIPS, Senior Circuit Judge:

This is an appeal by Michael Williams in which he challenges his convictions and the resulting sentences imposed for conspiring to possess with intent to distribute crack cocaine in violation of 28 U.S.C. § 846, knowingly possessing a firearm during and in relation to a drug trafficking offense in violation of 18 U.S.C. § 924(c), and being a convicted felon in possession of several firearms in violation of 18 U.S.C. § 922(g)(1). We affirm in part and reverse and remand in part.

I.

On April 19, 1995, local law enforcement officers arrested Michael Williams, Pedro Gonzalez, and Juan Gonzalez, Jr. for selling cocaine out of a mobile home in Murfreesboro, North Carolina. The officers apprehended the three men upon their return to the mobile home in an Oldsmobile Ninety-Eight. Upon searching the vehicle, the officers discovered a .45 caliber pistol, a 9mm Smith and Wesson handgun, 2.9 grams of cocaine base (crack), .7 grams of cocaine powder, and about $800 in cash. Williams was immediately arrested, handcuffed, and placed in the back seat of a police vehicle. The officers then proceeded to search Williams's parked Chevy Blazer finding additional firearms, considerable ammunition, and approximately $7000 in cash. During this search, Williams escaped from the police vehicle and was not apprehended until the following morning.

Testimony at trial revealed that all three defendants had come to North Carolina from their hometown of Allentown, Pennsylvania. At Williams's request, both Gonzalezes had accompanied Williams on a trip from there through Ohio and Virginia on their way to North Carolina. In Ohio, Williams showed the Gonzalezes "two cookies" of crack cocaine claiming that they weighed 10 ounces. After arriving

2

in North Carolina, the three men stayed at a mobile home belonging to a friend of Williams.

Pedro Gonzalez, who agreed to cooperate with the government after pleading guilty on two counts, testified that during their stay Williams directed him to distribute crack cocaine and supplied $1000 worth of "$20 hits" of crack cocaine. Pedro Gonzalez also testified that he had sold cocaine with Williams in North Carolina on a prior visit and that Williams distributed cocaine in Pennsylvania as well. Other witnesses also testified that Williams had engaged in distribution of both crack and cocaine powder.

Several witnesses also testified that Williams possessed various firearms and carried or used them frequently on and just prior to the date of his arrest. Pedro Gonzalez explained that Williams almost always carried the .45 caliber pistol in a holster strapped to his side when orchestrating or completing drug deals. Another witness, John Hendrick, testified that Williams was carrying a firearm when he sold Hendrick a substantial amount of crack.

At the conclusion of the trial, the jury returned a verdict of guilty on all three counts against Williams. The presentence report, prepared by the probation office following the verdict, attributed 712.5 grams of crack cocaine and 113.4 grams of cocaine powder to Williams. The quantities were derived mainly from out-of-court statements of Pedro Gonzalez. The PSR also recommended that Williams be assessed a two-level enhancement for obstruction of justice. At the sentencing hearing, the district court rejected objections by Williams to both the drug quantity amount and the obstruction of justice enhancement recommended by the PSR. The court then sentenced Williams to imprisonment for a term of 384 months.

This appeal followed. On it, Williams raises various claims of error affecting his convictions and the sentences imposed.

II.

Williams first argues that the district court erroneously instructed the jury regarding the reasonable doubt standard. The following instruction was given to the jury:

3

> The law does not require a defendant to prove his innocence or produce any evidence at all. The government has the burden of proving a defendant guilty beyond a reasonable doubt, and if it fails to do so, you must find the defendant not guilty.
>
> And thus while the government's burden of proof is a strict or heavy burden, it is not necessary that the defendant's guilt be proven beyond all possible doubt. It is only required that the government's proof exclude any reasonable doubt concerning the defendant's guilt.
>
> Now, reasonable doubt is a real doubt based upon reason and common sense and careful and impartial consideration of all the evidence in the case.

(J.A. at 210.)

Before the jury was charged, Williams requested a more detailed instruction defining reasonable doubt. The district court refused. Williams now complains that the reasonable doubt instruction as given entirely failed to provide any meaning to the concept because it did not define the term. Alternatively, he argues that, to the extent a definition was offered, it was incomplete and improperly reduced the government's burden of proof.

It is per se reversible error to give a constitutionally deficient reasonable doubt instruction. Sullivan v. Louisiana , 508 U.S. 275 (1993). The proper inquiry in reviewing a reasonable doubt instruction is whether there is a reasonable likelihood that the jury applied the reasonable doubt standard in an unconstitutional manner. Victor v. Nebraska, 511 U.S. 1, 5 (1994). The trial court is not required to define reasonable doubt as a matter of course so long as the jury is instructed that a defendant's guilt must be proven beyond a reasonable doubt; the Constitution does not obligate a court to further define the standard. Id.

In accordance with Victor and because of our belief that efforts to define reasonable doubt are likely to confuse rather than clarify the

concept, we have repeatedly held that a district court need not, and in fact should not, define the term "reasonable doubt" even upon request. United States v. Reives, 15 F.3d 42, 45 (4th Cir. 1994) ("[W]e have consistently and vigorously condemned the attempts of trial courts to define reasonable doubt."); United States v. Adkins, 937 F.2d 947, 950 (4th Cir. 1991) (expressing a "categorical disdain" for attempts at defining reasonable doubt). Therefore, Williams's claim that the district court erroneously refused to define reasonable doubt is contrary to the law of this circuit.

Williams's argument that the district court's instruction improperly lessened the government's burden of proof is similarly unpersuasive. In Adkins, we expressly held that an instruction containing the first two paragraphs quoted above from the district court's charge survived constitutional scrutiny. 937 F.2d at 949-50. In particular, we observed that the instruction "left `reasonable doubt' to its `self-evident meaning comprehensible to the lay juror.'" Id. at 949 (citations omitted).

The district court's instruction that "reasonable doubt is a real doubt based upon reason and common sense and careful and impartial consideration of all the evidence in the case" does not convert the Adkins-approved portion of the instruction into an unconstitutional definition. This additional sentence merely admonished the jury to exercise reason and unbiased diligence in reaching a decision. This general guidance neither impeded the jury's application of the "self-evident meaning" of reasonable doubt nor "undermine[d] or destroy-[ed] their common sense appreciation of that term's meaning." Murphy v. Holland, 776 F.2d 470, 476 (4th Cir. 1985), vacated on other grounds, 475 U.S. 1138 (1986). It therefore did not reduce the government's burden of proof. See Truesdale v. Moore, 142 F.3d 749 (4th Cir. 1998) (holding that an instruction equating "reasonable doubt" with "real doubt" did not improperly reduce the government's burden of proof).

III.

Williams next argues, for the first time, that the indictment was facially defective because, in count two, it charged him with "possessing," rather than "using" or "carrying," a firearm in connection with a drug trafficking crime under § 924(c). Although an objection based

5

on the sufficiency of an indictment can be lodged at any time, if it is first raised on appeal, the "indictment . . .[is] construed more liberally . . . and every intendment is then indulged in support of . . . sufficiency." United States v. Sutton, 961 F.2d 476, 479 (4th Cir. 1992); United States v. Vogt, 910 F.2d 1184, 1200 (4th Cir. 1990). Moreover, "where the post-verdict challenge to the indictment relates to the absence of an element, the indictment will be held sufficient if it contains words of similar import." Id. at 1201 (quotation and citation omitted).

To pass constitutional muster, an indictment must (1) indicate the elements of the offense and fairly inform the defendant of the exact charges and (2) enable the defendant to plead double jeopardy in subsequent prosecutions for the same offense. Sutton, 961 F.2d at 479. "One of the principal purposes of an indictment is to apprise the accused of the charge or charges against him so he can prepare his defense." United States v. Fogel, 901 F.2d 23, 25 (4th Cir. 1990).

The mere failure to track the precise language of a statute does not without more, constitute error. See Sutton, 961 F.2d at 479 (finding that failure to allege "scienter" in indictment is not fatal where defendant was not prejudiced in any manner); Vogt, 910 F.2d at 1201 (upholding sufficiency of indictment despite lack of specific mention of the "defraud" element in the underlying charge). Notably, the Ninth Circuit has recently rejected a claim identical to the one raised by Williams. In United States v. Ruelas, 106 F.3d 1416 (9th Cir.), cert. denied, 117 S. Ct. 2470 (1997), the defendant alleged that the indictment was insufficient because, in the body of the § 924(c) count, it stated that he "possessed," rather than "used or carried," a firearm. Acknowledging that Bailey v. United States, 516 U.S. 137 (1995), distinguished the term "possess" from the terms "use or carry," the Ninth Circuit nonetheless upheld the indictment because its specific reference to § 924(c) adequately informed the defendant of the elements of the charged offense. Ruelas, 106 F.3d at 1419. Moreover, the court commented that "if [the defendant] believed he did not have adequate notice of the elements of the 924(c)(1) offense, he should have resolved any ambiguity by bringing an appropriate motion before pleading guilty." Id.

Assessed under the more forgiving standard for post-verdict review, Williams's claim of error fails. In challenging the indictment,

6

Williams does not contend that its imprecision made him unable to prepare an adequate defense, or to be aware of the charge against him, or otherwise specifically impaired his ability to defend himself. Instead, he simply points out the discrepancy and complains that it is a fatal jurisdictional defect. Because he has demonstrated no prejudice from the alleged imprecision, we reject his claim.

IV.

Williams next contends that the failure to arraign on a superseding indictment requires a reversal. We disagree.

Williams was originally charged and arraigned on an indictment alleging, inter alia, that he possessed a 9mm Smith and Wesson handgun during and in relation to a drug trafficking offense in violation of § 924(c). Following his not guilty plea, a superseding indictment was filed that modified the § 924(c) count by adding that he also possessed a .45 caliber handgun during the offense. Although it does not appear that Williams was arraigned on the superseding indictment, the record reveals that he was served with a copy the week before his trial. He now claims that the failure to re-arraign constitutes reversible error because it compromised his ability to defend himself.

A failure to arraign only warrants a reversal if it causes prejudice or impairs a substantial right. Garland v. Washington, 232 U.S. 642 (1914). Williams has suggested no prejudice from the minor alteration to the original indictment; his brief contains no arguments as to how his defense was impaired or prejudiced. In light of the fact that the superseding indictment merely added an additional handgun and Williams was notified of this modification, no reversible error was committed.

V.

Next, Williams challenges the district court's instruction on the "use or carry" element of § 924(c) in view of Bailey v. United States, 516 U.S. 137 (1995). Without reiterating the instruction in full, it is sufficient to note that the instruction clearly violated Bailey. As Williams did not object to the erroneous instruction at trial, he must dem-

onstrate plain error to warrant a reversal or remand. Johnson v. United States, 117 S. Ct. 1544 (1997) (applying to comparably erroneous instruction the plain error test of United States v. Olano, 507 U.S. 725 (1993)). Under the Olano/Johnson plain error analysis, Williams must show that (1) there is error, (2) the error is plain, and (3) the error affects substantial rights. Johnson, 117 S. Ct. at 1549. If all three conditions are met, we may then exercise our discretion to notice the forfeited error, but even then only if the error "seriously affects the fairness, integrity, or public reputation of judicial proceedings." Id. In applying the final, discretionary step, we consider whether the trial evidence was "overwhelming" and "essentially uncontroverted." Id. at 1550. "Central to this inquiry is a determination of whether, based on the record in its entirety, the proceedings against the accused resulted in a fair and reliable determination of guilt." United States v. Cedelle, 89 F.3d 181, 186 (4th Cir. 1996).

Accepting that Williams satisfies the first two prongs and assuming that such an erroneous "use" instruction affects substantial rights, we would yet decline to exercise our discretion to notice the error. Looking to the evidence adduced at trial, Pedro Gonzalez and Hendrick both testified without contravention that Williams carried a firearm in his holster when he conducted drug transactions. Hendrick specifically recounted that, when he purchased crack from Williams in April 1995, Williams was carrying a handgun. In addition, uncontradicted evidence also established that, just prior to his arrest and upon his return from selling crack, Williams placed a firearm that he had been carrying beneath his seat in the Oldsmobile. The police recovered this firearm during their search of the vehicle.

The above evidence was not rebutted at trial and is not challenged on appeal. In fact, Williams acknowledges that most of the evidence presented supports the finding that he carried a handgun in relation to a drug trafficking offense. Notwithstanding, he maintains that a remand is necessary because at least one piece of evidence--Pedro Gonzalez's testimony that he went recreational shooting with Williams in Ohio--when viewed alone, could not support a conviction under § 924(c).

This testimony, however, does not controvert or even call into doubt the considerable testimony that Williams carried a firearm dur-

8

ing and in relation to a drug trafficking crime. As was the case in Johnson, the evidence at trial in this case was "overwhelming" on the "carry" element, 117 S. Ct. at 1550, and "permit[ted] no other conclusion," Cedelle, 89 F.3d at 186, but that Williams was guilty. Under these circumstances, exercising our discretion not to notice the instructional error will not result in a miscarriage of justice or affect the fairness or integrity of the proceedings. "Indeed, it would be the reversal of a conviction such as this which would have that effect." Johnson, 117 S. Ct. at 1550.

VI.

Next, Williams challenges the district court's attribution of drug quantities for purposes of determining his base offense level. He maintains that the evidence does not support the district court's conclusion, made without factual findings, that he be held accountable for over 13,000 kilograms of marijuana equivalency when, in fact, the police only found in his possession 2.9 grams of crack cocaine and .7 grams of cocaine powder, which would be equivalent to only around 58 kilograms of marijuana.

Because the approximation of drug quantities is so critical a factor in determining sentence length for drug trafficking offenses, specific requirements for making and reviewing factual determinations of drug quantities apply. If the defendant objects to a quantity recommended in a presentence report, the district court must make an independent resolution of the factual issues raised by the objection. U.S. Sentencing Guidelines Manual § 6A1.3 (1997); United States v. Gilliam, 987 F.2d 1009, 1013 (4th Cir. 1993). The court can do this either by a separate recitation of its findings as to the disputed matters or by express adoption of the findings contained in the presentence report. United States v. Morgan, 942 F.2d 243, 245 (4th Cir. 1991).

If the defendant's objection to a particular PSR finding fails to articulate the reasons why the facts asserted are unreliable, untrue or inaccurate, the district court need not undertake an in-depth review. Without an affirmative suggestion that the PSR recommendation is unsound, the court is "free to adopt the findings of the [PSR] without more specific inquiry or explanation." United States v. Terry, 916 F.2d 157, 162 (4th Cir. 1990). In other words, "the Government car-

9

ries its burden if a defendant fails to properly object to a recommended finding in a presentence report that the court determines to be reliable." Gilliam, 987 F.2d at 1013. If the district court makes adequate findings regarding drug quantity, those findings stand unless determined on review to be clearly erroneous. See United States v. Cook, 76 F.3d 596, 604 (4th Cir. 1996).

In this case, the PSR recommended that 712.5 grams of cocaine base and 113.4 grams of cocaine powder be attributed to Williams. 429 grams of the cocaine base and the entire amount of cocaine powder was said to be derived from "an unprotected statement" given out of court by Pedro Gonzalez detailing Williams's drug activities in both Pennsylvania and North Carolina.[1] Testimony from trial provided the asserted basis for the remaining 283.5 grams of cocaine base.

At sentencing, Williams objected to the attribution of any drug amount above the quantities actually recovered by the officers at the scene of his original arrest. He also challenged the estimates as speculative and uncorroborated. The district court denied Williams's objections stating:

> I tried the case and I have reviewed my notes on the amount, and the Court is satisfied without any further consideration of this matter that there was an equivalency of more than ten thousand kilos of marijuana. And there was an amount of cocaine base and cocaine powder that totaled more than 13,000. So that is correct.

(J.A. at 240-41.)

By its literal import, this statement did not represent an express adoption by the district court of the PSR's findings regarding drug quantities. That, however, does not necessarily prevent a determination upon review that the district court's sentencing process involved an implicit adoption of the PSR findings. In certain situations,

_____

[1] The PSR did not mention when Pedro Gonzalez made this statement, to whom he made it, the circumstances under which it was made, or how it came to the attention of the probation officer.

10

depending upon the context, a sentencing court's denial of an objection may properly be taken as an implicit adoption of the findings at which the objection was aimed. See United States v. Walker, 29 F.3d 908, 912 (4th Cir. 1994). In such a situation, confident appellate review may be undertaken on the basis of such an implicit adoption. Regrettably, however, this is not such a case. Rather than merely denying Williams's objections after reviewing the PSR findings (which likely would have been sufficient in light of the general nature of the objections), the district court explained that, based on its notes and recollection from the trial, the drug amount suggested in the PSR conformed to the court's belief that the drug quantity met the threshold equivalency level of 10,000 kilograms of marijuana.[2] The district court's identification of the source of its determination could not reasonably be construed as an adoption of the PSR findings because the drug amounts in the PSR were derived predominantly from Pedro Gonzalez's unprotected out-of-court statements that were not introduced at trial. Because the district court expressly indicated reliance on factual predicates that differed from the underlying findings in the PSR, we cannot fairly imply an adoption of the PSR findings by the court. See United States v. Truesdale, 23 F.3d 878, 887 (4th Cir. 1993) ("[T]here seems to be no doubt that the district court could have expressly found that there was insufficient bases for th[e] objections. The problem is that the court made no such findings."); Morgan, 942 F.2d at 246 (indicating that the mere imposition of a sentence consistent with the presentence report does not satisfy the requirement of an express finding).

Without being able to rely on the factual findings in the PSR and lacking specific findings by the district court based upon the trial testimony (and court notes) generally identified as the court's source, it

_____

**2** Based on the drug quantity table in the U.S. Sentencing Guidelines Manual § 2D1.1(c) (1997), a drug quantity of between 10,000 and 30,000 kilograms of marijuana or its equivalency warrants an offense level of 36. Relying on its trial notes, the district court indicated that it was satisfied that the combined amount of cocaine base and cocaine powder translated into a total of more than 13,000 kilograms of marijuana. Citing both trial testimony and out-of-court statements, the PSR suggested a total marijuana equivalency of 14,272.68 kilograms. Thus, under either approach, the resulting base offense level was 36.

11

is impossible for us to review the district court's quantity findings for clear error. We might assume from the court's general reference that it accepted all of the trial testimony about the scope of Williams's drug dealings. But we cannot safely do so, and if any less than all were assumed, it is not manifest from the record what was accepted and what rejected in coming up with the final quantities found. For discrepancies and possible overlaps in the whole range of testimony abound. For example, Pedro Gonzalez testified that Williams transported two blocks or "cookies" of crack less than an inch thick, weighing about 10 ounces to North Carolina. Similarly, Hendrick testified that he saw Williams with a block of crack several inches thick weighing approximately half of a kilogram (17.6 ounces). From the record, it could not confidently be determined whether the district court credited one or both of these witnesses's statements and, more importantly, whether the court treated the amount cumulatively (27.6 grams) or as merely describing the same block of cocaine.**3**

In a situation such as this, when the district court has not expressly or by implication adopted the PSR findings nor made sufficiently detailed independent findings on the critical issue of drug quantity for sentencing purposes, we have no recourse but to remand for adequate findings. See United States v. Chambers, 985 F.2d 1263, 1269 (4th Cir. 1993).**4**

VII.

Finally, Williams challenges the district court's assessment of a two-level enhancement for obstruction of justice. Because the facts underlying this enhancement are undisputed and the claim involves a

_____

**3** A brief review of the entire trial record would seem to support the notion that the trial court must have treated Pedro Gonzalez's and Hendrick's testimony as describing separate and distinct cocaine amounts in order to arrive at a figure of greater than a 13,000 kilogram marijuana equivalency. Yet, in its brief, the government referred to testimony of these two as describing the same cocaine and, thus, corroborating its existence rather than establishing two, separate drug quantities.

**4** In view of this conclusion, we do not reach Williams's further challenges to the reliability of Pedro Gonzalez's "unprotected statement" and the district court's failure to estimate conservatively the drug quantities.

12

purely legal issue, we review the district court's ruling de novo. See United States v. Hicks, 948 F.2d 877, 884 (4th Cir. 1991).

Section 3C1.1 of the Sentencing Guidelines instructs that "[i]f the defendant willfully obstructed or impeded . . . the administration of justice during the investigation, prosecution, or sentencing of the instant offense, increase the offense level by 2 levels." U.S. Sentencing Guidelines Manual § 3C1.1 (1997). The commentary to this section further explains the types of conduct that do and do not warrant the enhancement. In providing "a non-exhaustive list of examples of the types of conduct to which this enhancement applies," Application Note 3 explains that, inter alia, the increase is triggered by conduct that involves "escaping or attempting to escape from custody before trial or sentencing; or willfully failing to appear, as ordered, for a judicial proceeding." Id. App. Note 3(e) (emphasis added). Conversely, Application Note 4 offers a non-exhaustive list of the type of conduct that "ordinarily do[es] not warrant application of this enhancement but may warrant a greater sentence within the otherwise applicable guideline range."[5] Included in this list is conduct characterized as "avoiding or fleeing from arrest" unless the conduct recklessly creates a substantial risk of death or serious bodily injury to another person. Id. App. Note 4(d) (emphasis added);§ 3C1.2.

In this case, Williams was arrested, handcuffed, and escorted to a deputy's car. The officers then placed him in the back seat, in a compartment separated from the front seat of the car by a partition. After being detained in the vehicle and during the officers' search of his Chevy Blazer, Williams managed to escape. He was apprehended the following morning, having cut through his handcuffs and hidden them under his sleeves.

Williams argues that his conduct falls within a sort of "gray area" created by the wording of the two application notes. Although he had already been arrested, Williams contends that he was not truly in custody within the intent of Application Note 3(e) because his escape

_____

[5] Because this case turns on the interpretation of App. Note 3(e), we make no comment regarding whether the inclusion of the term "ordinarily" in App. Note 4 confers more discretion upon the courts when evaluating conduct of the type described therein.

13

was essentially part of the arrest episode. He notes that many of the cases applying the flight-from-custody enhancement deal with escape attempts from jail or failures to appear at required court hearings--all events transpiring well after an arrest was fully consummated. See, e.g., United States v. Miller, 77 F.3d 71 (4th Cir. 1996) (applying enhancement where defendant fled state before sentencing); United States v. Melton, 970 F.2d 1328 (4th Cir. 1992) (applying enhancement where defendant attempted to escape from county jail by kicking deputy). According to Williams, "a defendant's flight is considered `from arrest' where it can be attributed to the `instinctive flight of a suspect who suddenly finds himself in the power of the police.'" United States v. Mondello, 927 F.2d 1463, 1466 (9th Cir. 1991) (interpreting § 3C1.1 before the 1991 amendments that added the commentary at issue in this case).

To support his position, Williams relies predominantly on a Seventh Circuit decision that upheld a district court's refusal to apply the obstruction of justice enhancement under arguably similar circumstances. Draves v. United States, 103 F.3d 1328 (7th Cir.), cert. denied, 117 S. Ct. 2528 (1997). In Draves, police officers went to the defendant's home to execute two arrest warrants. The officers first located the defendant, informed him of the charges against him, handcuffed him, and placed him in the back seat of their car. Leaving the defendant in the vehicle, the officers then initiated their search for the other party. While the officers were attending to the other party, the defendant seized the opportunity to flee from the arresting officers on foot. The defendant was apprehended a mere three houses away from the scene of arrest. Id. at 1336-37.

The district court in Draves denied an obstruction of justice enhancement on these facts, finding that "for all practical purposes when Mr. Draves fled this arrest was still in progress." Id. at 1337. In affirming the district court, the Seventh Circuit declared that "[o]bstruction of justice cases distinguish panicked, instinctive flight from calculated evasion." Id. (citations omitted). Rejecting the government's request for a bright-line test, the court held that "Draves' conduct had not, due to its duration or acts occurring in the course thereof, ripen[ed] into a willful attempt to impede or obstruct the administration of justice." Id. (internal quotations omitted). Observing that Application Notes 3 and 4 are not mutually exclusive, the court

14

applied a discretionary test in which "[c]ircumstances may arise . . . where formal custody is present, yet the defendant's action is best viewed as the instinctive flight of a suspect who suddenly finds himself in the power of the police." Id. (internal quotations omitted). Accordingly, the court held that the proper yardstick for assessing the applicability of § 3C1.1 is "whether defendant's departure from the scene of the arrest was spontaneous or calculated." Id. at 1338.

To the extent that the Draves opinion counsels against applying the enhancement where the escape occurs contemporaneously with the arrest episode, we respectfully disagree. Guidelines commentary is binding unless it violates federal law or otherwise conflicts with a plain reading of the guideline. Stinson v. United States, 508 U.S. 36 (1993). In this instance, the language of Application Note 3(e) clearly states that the enhancement applies to escape or attempts to escape "from custody." On the other hand, Application Note 4(d) provides that it is not intended to apply to avoidance or flight "from arrest." As Williams does not suggest that either provision violates federal law or is inconsistent with § 3C1.1, we may only apply the commentary as written. United States v. Banks, 130 F.3d 621, 625 (4th Cir. 1997), cert. denied, 118 S. Ct. 1400 (1998).

Williams's assertion that we should interpret the term "from custody" to exclude conduct occurring during the arrest episode, even if technically arising after formal arrest, is unpersuasive. We read the commentaries as recognizing a clear dichotomy between the state of being arrested and that of being in custody. The two states are well-settled as separate ones in the law. While whether one or the other exists in particular circumstances may create difficult factual issues, we do not believe the commentaries permit their conversion into the legal hybrid, "custody during an arrest episode," for which Williams contends. The problem is only to determine a matter that it is possible to determine under the law: whether at the critical time an arrest had been accomplished and a state of legal custody had begun. See United States v. Draper, 996 F.2d 982, 985-86 (9th Cir. 1993) ("[F]or purposes of the obstruction guideline, `custody' need only involve some degree of official control over a defendant such that a subsequent evasion amounts to more than mere `avoiding or fleeing from arrest.'"). Here, there was no legal error in the district court's conclusion that on the undisputed facts Williams's escape was "from custody," not

15

"from arrest." The obstruction of justice enhancement was therefore properly imposed.

VIII.

For the reasons stated above, Williams's convictions and the application of a two-level enhancement for obstruction of justice are affirmed. Because, however, the record is insufficient to permit a meaningful appellate review respecting the amount of drugs attributed to Williams for sentencing purposes, we vacate the sentence and remand for resentencing consistent with this opinion.

<u>AFFIRMED IN PART, REVERSED IN PART
AND REMANDED FOR RESENTENCING</u>

16