PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
　　　　　*Plaintiff-Appellee,*

v.

KAREEM BERLIN FARRIOR,
　　　　　*Defendant-Appellant.*

No. 07-4498

Appeal from the United States District Court
for the Western District of Virginia, at Roanoke.
Glen E. Conrad, District Judge.
(7:06-cr-00045-gec)

Argued: May 16, 2008

Decided: August 5, 2008

Before WILLIAMS, Chief Judge, TRAXLER, Circuit Judge, and
Terry L. WOOTEN, United States District Judge for the District of
South Carolina, sitting by designation.

---

Affirmed by published opinion. Chief Judge Williams wrote the opinion, in which Judge Traxler and Judge Wooten joined.

---

### COUNSEL

**ARGUED:** Rena Gladys Berry, Roanoke, Virginia, for Appellant. Craig Jon Jacobsen, OFFICE OF THE UNITED STATES ATTORNEY, Roanoke, Virginia, for Appellee. **ON BRIEF:** John L. Brownlee, United States Attorney, Roanoke, Virginia, for Appellee.

---

**OPINION**

WILLIAMS, Chief Judge:

A jury convicted Kareem B. Farrior of possession with intent to distribute an unspecified quantity of crack cocaine, in violation of 21 U.S.C.A. § 841(a)(1) and (b)(1)(C) (West 1999 & Supp. 2008) (Count One), and possession with intent to distribute 50 grams or more of crack cocaine, in violation of 21 U.S.C.A. § 841(a)(1) and (b)(1)(A) (West 1999 & Supp. 2008) (Count Two). Because Farrior had two previous convictions for felony drug offenses, the district court sentenced him as a career offender and, under 21 U.S.C.A. § 841(b)(1)(A), imposed a mandatory minimum sentence of life imprisonment. Farrior appeals his convictions and sentence on numerous grounds and for the reasons that follow, we affirm.

I.

A.

On April 16, 2006, Sergeant Anderson of the Pulaski, Virginia Police Department received a tip that a green car with New York licence plates was involved in drug trafficking in the Highland Terrace area in Pulaski. Pulaski police officers located the vehicle in the Highland Terrace area that night, but it was unoccupied.

On April 21, 2006, at approximately 1:15 a.m., Officer Morris of the Pulaski Police Department observed the same green car parked at the end of Maple Street, an area known for drug trafficking. Again, the vehicle was unoccupied. Officer Morris relayed this information to Sergeant Anderson who advised him that this was the same vehicle about which Anderson had received the tip a week earlier.

Thereafter, Officer Morris parked his patrol cruiser on a nearby street to wait for the driver of the green car to return. Approximately five minutes later, Officer Morris observed the green car pass by him and noticed that the tag light was inoperable on the car. He decided to stop the car because of the inoperable tag light.

Shortly after the stop, Sergeant Anderson learned that Officer Morris had stopped the green car and that the driver was Farrior. Anderson contacted the police dispatcher to obtain Farrior's criminal history and to request that a canine unit arrive on the scene. Anderson then proceeded to the scene. In response to Sergeant Anderson's request, Officer Dowdy, an officer with a drug-sniff dog, also made his way to the scene.

After contacting Sergeant Anderson, Officer Morris requested Farrior's driver's license and car registration and returned to his patrol cruiser to check their validity. Both proved to be valid, and Officer Morris returned to Farrior's car. According to Officer Morris, who had just completed his field training months before the incident, he was not familiar with the process for giving warning tickets for inoperable tag light violations. Consequently, rather than issuing Farrior a traffic citation, Officer Morris returned Farrior's license and registration and orally warned him that he needed to have his tag light fixed. At this point, Officer Morris told Farrior that he was free to go.

Before Farrior pulled away, however, Officer Morris asked Farrior if he would mind stepping out of the car to talk. Farrior responded that he was willing to talk from inside his car. Given Farrior's willingness to speak with him, Officer Morris advised Farrior that the Pulaski Police Department was having problems in the area with drug-related crimes and asked Farrior if he had any drugs or weapons, to which Farrior replied that he did not. Officer Morris then asked Farrior if he could search Farrior's car, and Farrior agreed. Farrior exited his car and Officer Morris searched Farrior for weapons. Finding no weapons on Farrior's person, Officer Morris then searched the interior of Farrior's car.

While Officer Morris was searching the inside of Farrior's car, Sergeant Anderson arrived on the scene. As Officer Morris concluded his search, finding nothing suspicious, Sergeant Anderson, Officer Morris's superior, realized that a ticket had not been issued so he instructed Officer Morris to issue Farrior a written warning for the inoperable tag light. Officer Morris once again took Farrior's license and registration back to his patrol cruiser to write the warning ticket. Officer Morris completed the ticket and was explaining it to Farrior when Officer Dowdy and the drug dog arrived.

Upon arriving, Officer Dowdy was advised by Sergeant Anderson that Farrior had consented to a vehicle search. In response, Dowdy had his drug dog sniff the outside of the car, and it alerted to the presence of drugs in the trunk. Officer Dowdy then had the dog sniff the inside of the car, and this time it alerted to the console area. Because of this alert, Sergeant Anderson and Officer Dowdy searched the inside of Farrior's car again, this time noticing that the carpeting and consoles had been altered. At that point, Sergeant Anderson searched Farrior's trunk and found a black bag with a razor and some white powdery residue.

Sergeant Anderson informed Farrior that the drug dog had indicated the presence of drugs in the car and asked Farrior to remove his boots. Farrior at first refused, but Sergeant Anderson told him that he had no choice but to comply. Accordingly, Farrior kicked off his boots, and inside one of the boots Sergeant Anderson found 5.5 grams of crack cocaine and $2,720.

The officers arrested Farrior and issued him *Miranda* warnings. Farrior admitted that the cocaine was his, but stated that he had come to Pulaski to buy, not to sell cocaine. Farrior stated that the money in his boot was money that he had earned as a bus driver in Connecticut.

Less than one month later, on May 10, 2006, police officers in Roanoke, responding to a call that someone had been shot, found a wounded Farrior leaning against a car. Farrior, who had been shot three times, was taken to the hospital. As part of their investigation of the shooting, the police located Farrior's rental car one block from the scene of the shooting and had it towed. On May 12, 2006, after obtaining a search warrant for the vehicle, the police searched the vehicle and found 469.5 grams of crack cocaine in the trunk of the car, hidden inside Farrior's boot. On May 30, 2006, as Farrior was being discharged from the hospital, he was arrested by U.S. Drug Enforcement Administration agents.

B.

On June 1, 2006, a federal grand jury sitting in the Western District of Virginia returned a two-count indictment charging Farrior with possession with intent to distribute an unspecified quantity of crack

cocaine and possession with intent to distribute 50 grams or more of crack cocaine.

Before trial, Farrior filed a motion to suppress the evidence seized from the search of his vehicle and his person on April 21, 2006, contending that the seizure violated his Fourth Amendment rights. Following a hearing on the motion, the district court held that the search did not violate Farrior's Fourth Amendment rights because (1) his vehicle was legitimately stopped for an inoperable tag light; (2) he voluntarily consented to the search of his car; and (3) the officers had probable cause to search the inside of the car and trunk because a drug dog alerted to the presence of drugs in the vehicle while Officer Morris was issuing Farrior a warning ticket. Accordingly, the district court denied Farrior's motion to suppress, and the case proceeded to trial.

During jury selection, Farrior objected under *Batson v. Kentucky*, 476 U.S. 79 (1986), to the Government's strike of the only African American venire member, contending only that the strike was improper because he and the prospective juror are both African American. The district court denied Farrior's *Batson* challenge, concluding that the Government provided three race-neutral explanations for the strike.

The jury found Farrior guilty of both counts charged in the indictment. In response, Farrior moved for a new trial on the grounds that the Government improperly defined reasonable doubt in its closing argument and improperly invited the jury to place trust in the Government, thus cumulatively lessening the Government's burden of proof in the case. The district court denied Farrior's motion.

On June 26, 2006, the Government filed a prior-felony information pursuant to 21 U.S.C.A. § 851 (West 1999 & Supp. 2008), giving notice that Farrior was subject to the enhanced penalties set forth in 21 U.S.C.A. § 841(b)(1)(A) due to previous felony drug convictions in 1993 and 1996. Thereafter, a probation officer prepared a presentence report ("PSR"). The PSR calculated Farrior's advisory Guidelines range to be 360 months to life imprisonment, but because Farrior qualified as a career offender under 21 U.S.C.A. § 841(b)(1)(A), a status for which the mandatory minimum sentence is life imprison-

ment, the PSR adjusted the Guidelines range to recommend the statutory minimum sentence of life imprisonment.

At the sentencing hearing, Farrior objected to the PSR's conclusion that he qualified as a career offender. The district court disagreed and explained in its statement of reasons that it was imposing a mandatory life sentence pursuant to 21 U.S.C.A. § 841(b)(1)(A). Ultimately, the district court sentenced Farrior to 360 months imprisonment on Count One and to life imprisonment on Count Two, to run concurrently, followed by a 10-year term of supervised release.

Farrior timely appealed his convictions and sentence. We have jurisdiction pursuant to 18 U.S.C.A. § 3742(a) (West 2000) (providing for appellate jurisdiction over a "final sentence" entered by the district court) and 28 U.S.C.A. § 1291 (West 2006) (providing for appellate jurisdiction over "final decisions" of the district court).

## II.

On appeal, Farrior challenges: (1) the district court's denial of his motion to suppress; (2) the denial of his *Batson* objection to the Government's strike of the only African American on the venire panel; (3) the denial of his motion for a new trial based on the Government's closing argument; and (4) various aspects of his sentence. We address each argument in turn.[1]

## A.

We first turn to Farrior's motion to suppress evidence seized as a

---

[1]In addition to these arguments, Farrior also argues that there was insufficient evidence for the jury to find that he had intent to distribute crack cocaine; that he should have been granted credit for acceptance of responsibility; and that the district court erred by not declaring a mistrial because after the jury was dismissed, it was noticed that an incorrect verdict form was used, after which the jury completed the proper verdict form. Farrior contends that the jury's finding after it had been discharged is a violation of the Double Jeopardy Clause. Based on our careful review of the record, we conclude that these arguments are without merit.

result of the search of his vehicle and person on April 21, 2006. On this issue, we review the district court's factual findings for clear error and its legal conclusions *de novo. United States v. Perkins,* 363 F.3d 317, 320 (4th Cir. 2004). And, "[b]ecause the district court denied the motion to suppress, we construe the evidence in the light most favorable to the government." *Id.*

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures." U.S. Const. amend. IV. Following the Supreme Court's decision in *Terry v. Ohio*, 392 U.S. 1 (1968), "the law has become well-established that during a routine traffic stop, an officer may request a driver's license and vehicle registration, run a computer check, and issue a citation," *United States v. Rusher*, 966 F.2d 868, 876-77 (4th Cir. 1992), without running afoul of the Fourth Amendment. Any further investigative detention, however, "is beyond the scope of the *Terry* stop and therefore illegal unless the officer has a reasonable suspicion of a serious crime," *id.*, or the individual consents to the further detention, *United States v. Foreman*, 369 F.3d 776, 781 (4th Cir. 2004). The Supreme Court has held that a drug-dog sniff is not a "search" as that term is used in the Fourth Amendment. *United States v. Place*, 462 U.S. 696, 706-07 (1983). In order to perform the sniff, however, "there must be a seizure of the vehicle and, therefore, the person, requiring either consent to be detained or reasonable suspicion." *Foreman*, 369 F.3d at 781.

Farrior contends that his Fourth Amendment rights were violated in various ways. He contends that the initial stop should have been terminated at the point when Officer Morris first told him that he was free to go. He asserts that he did not freely consent to the search of his vehicle but was forced to get out of the car. Since no consent was given, he argues that the subsequent search and seizure violated his Fourth Amendment rights because the officers lacked probable cause to continue the stop beyond the scope of the initial encounter. Farrior also contends that even if consent had been given, the duration of time between the purported consent and the time at which Officer Dowdy arrived with the canine unit was unreasonable and in violation of his Fourth Amendment rights. This unconstitutional detention, Farrior argues, precipitated the drug-dog sniff that led to the officers' recovery of all the drug-related evidence.

The district court held that the initial stop was constitutional because Officer Morris possessed (at the least) reasonable suspicion that Farrior was driving with an inoperable tag light, in violation of Virginia Code Ann. § 46.2-1013 (2005); that the search of Farrior's car did not implicate the Fourth Amendment because Farrior voluntarily consented to the encounter with Officer Morris after the traffic stop was completed; and that the drug-dog sniff was permissible under *Illinois v. Caballes*, 543 U.S. 405 (2005), because it occurred during the time that the officers were issuing Farrior a ticket for the inoperable tag light. We agree with the district court's analysis.

Contrary to Farrior's assertion, the officers did not unreasonably prolong the traffic stop. Under our and other circuits' precedents, the traffic stop ended once Officer Morris returned his license and registration, orally warned him to fix his tag light, and told him that he was free to go. *See, e.g.*, *United States v. Singh*, 363 F.3d 347, 356 (4th Cir. 2004) (holding that once an officer issues a warning or citation and returns a driver's license and registration, the driver may "proceed on his way, without being subject to further delay by police for additional questioning" (internal quotation marks omitted)); *United States v. Alexander*, 448 F.3d 1014, 1016 (8th Cir. 2006) ("Once an officer has decided to permit a routine traffic offender to depart with a ticket, a warning, or [no ticket at all], the Fourth Amendment applies to limit any subsequent detention or search."). But the end of the traffic stop did not signal the beginning of an unconstitutional seizure in this case.

The Supreme Court has made it very clear that a "seizure does not occur simply because a police officer approaches an individual and asks a few questions." *Florida v. Bostick*, 501 U.S. 429, 434 (1991). In the absence of a seizure, a police-citizen encounter is considered consensual and "will not trigger Fourth Amendment scrutiny." *Id.* at 434. Under *Bostick*, the question is whether a reasonable person would have felt free to decline the officer's request or otherwise terminate the encounter. *Id.* at 439. So long as a reasonable person would feel free "to disregard the police and go about his business," *California v. Hodari D.*, 499 U.S. 621, 628 (1991), the encounter is consensual and no reasonable suspicion is required. *See also United States v. Sullivan*, 138 F.3d 126, 131 (4th Cir. 1998) ("When a stop is over and its purpose served, . . . mere questioning by officers, with-

out some indicated restraint, does not amount [to] . . . a seizure under the Fourth Amendment."). Employing the *Bostick* inquiry, the district court determined that the encounter between Farrior and Officer Morris was consensual because "a reasonable person in Farrior's position would have felt free to decline Officer Morris's request." (J.A. 60-61.) We do not find any error in the district court's analysis.

Here, Officer Morris asked Farrior a few questions after ending the traffic stop, and Farrior voluntarily responded to the questions in what appears from the record to have been a completely consensual exchange. *See United States v. Weaver*, 282 F.3d 302, 309 (4th Cir. 2002) (recognizing that "[c]ircumstances where the citizen would feel free to go, but stays and has a dialogue with the officer, are considered consensual"). The fact that Officer Morris had returned Farrior's license and registration also strongly indicates that the encounter was consensual and that no seizure occurred within the meaning of the Fourth Amendment. *See Sullivan*, 138 F.3d at 131 (holding that a search was consensual even though an officer repeatedly asked questions about the presence of illegal items in the car after returning a suspect's license at the conclusion of a traffic stop). Indeed, on numerous occasions we have found similar exchanges between an officer and an individual after the officer has returned the individual's license and registration to be consensual and thus not violative of the Fourth Amendment. *See, e.g.*, *United States v. Meikle*, 407 F.3d 670, 673 (4th Cir. 2005); *United States v. Lattimore*, 87 F.3d 647, 653 (4th Cir. 1996) (en banc); *Rusher*, 966 F.2d at 876-77. We therefore conclude that, under all the circumstances, Officer Morris's questioning of Farrior after the traffic stop had ended did not constitute a subsequent seizure subject to the strictures of the Fourth Amendment's protections.

The facts of the encounter between Officer Morris and Farrior also confirm that Farrior voluntarily consented to the search of his vehicle. Whether consent is voluntary is a factual determination made by examining the totality of the circumstances, *Schneckloth v. Bustamonte*, 412 U.S. 218, 248-49 (1973), and here, the district court determined that Farrior's "initial consent to search the vehicle was voluntarily given." (J.A. 61.) In reaching this determination, the district court relied on several facts, including the following: (1) Farrior initially declined Officer Morris's request to step out of his car to talk,

but agreed to talk with Officer Morris from inside his car; (2) Officer Morris returned Farrior's license and explicitly told Farrior that he was free to go before asking him to consent to a search; and (3) Farrior told Officer Morris that he could search his car after Officer Morris explained that Pulaski was having a lot of drug problems.

We have recognized that when the lower court "bases a finding of consent on the oral testimony at a suppression hearing, the clearly erroneous standard is particularly strong since the [court] had the opportunity to observe the demeanor of the witnesses." *Lattimore*, 87 F.3d at 651 (internal quotation marks omitted). Here, based on the totality of the circumstances, we find no error in the district court's factual conclusion that Farrior validly consented to the search of his car.

Having determined that Farrior validly consented to the search of his car, we next consider whether the timing and sequence of the events surrounding Officer Morris's issuance of a warning ticket to Farrior violated the Fourth Amendment. As recounted above, after Officer Morris finished his search of Farrior's vehicle, Sergeant Anderson instructed Officer Morris to issue Farrior a written warning for the inoperable tag light. Based on Officer Morris's testimony, the district court found that Officer Morris had just completed his field training months before the traffic stop. At field training, Officer Morris was trained to issue summonses in situations like these, but he did not like to give summonses because they required the defendant to appear in court for a minor offense. At the time of the traffic stop, Officer Morris did not know how to issue a warning ticket. Given this testimony, the district court found that there was no "attempt at subterfuge or stalling on the part of the officers" and that the additional time required to take Farrior's license and registration and write the ticket was minimal. (J.A. 62.) Based on these findings, the district court concluded that "despite being unusual in sequence, there is nothing in these events that impinges the defendant's constitutional rights." (J.A. 62.) We agree.

"As is obvious from the constitutional text, the central inquiry under the Fourth Amendment is reasonableness, for 'what the Constitution forbids is not all searches and seizures, but unreasonable searches and seizures.'" *United States v. McCoy*, 513 F.3d 405, 410

(4th Cir. 2008)(quoting *Elkins v. United States*, 364 U.S. 206, 222 (1960)). Given the particular factual findings of the district court, we find nothing unreasonable about the sequence of the events surrounding Officer Morris's issuance of a warning ticket to Farrior.

We also agree with the district court that there was "nothing in the timing or conduct of the canine search [which] violated [Farrior's] Fourth Amendment rights." (J.A. 63.) Here, the drug sniff — which, as noted above, does not constitute a "search" under the Fourth Amendment, *Place*, 462 U.S. at 706-07 — occurred while Officer Morris was properly in possession of Farrior's license and registration (he was issuing a written warning to Farrior, as instructed by Sergeant Anderson). Therefore, Farrior's Fourth Amendment rights were not violated. *See Caballes*, 543 U.S. at 409 ("[T]he use of a well-trained narcotics-detection dog—one that does not expose noncontraband items that otherwise would remain hidden from public view—during a lawful traffic stop, generally does not implicate legitimate privacy interests." (internal quotation marks and citation omitted)).

Moreover, even if were inclined to accept Farrior's argument that to perform the first drug-dog sniff, which required a seizure of Farrior's vehicle, *Foreman*, 369 F.3d at 786, the officers needed separate consent or reasonable suspicion, our conclusion that no constitutional violation occurred would not change. In light of the district court's finding that the "additional time required to take the license and registration and write the ticket was minimal," (J.A. 62), we conclude that any delay in conducting the first drug-dog sniff amounted to a *de minimis* intrusion on Farrior's liberty interest. Thus, it was not unreasonable as a violation of his Fourth Amendment rights. *See Ingraham v. Wright*, 430 U.S. 651, 674 (1977) ("There is, of course, a de minimis level of imposition with which the Constitution is not concerned."); *Alexander*, 448 F.3d at 1017 ("[E]ven if a dog sniff is thirty seconds to two minutes over the line drawn at the end of a routine traffic stop, a two minute delay is a *de minimis* intrusion on the driver's personal liberty that does not violate the Fourth Amendment." (internal quotation marks omitted)).

B.

Having determined that Farrior's Fourth Amendment rights were not violated, we next turn to consider Farrior's contention that the dis-

trict court erred in rejecting his *Batson* challenge. "A finding by the [trial] court concerning whether a peremptory challenge was exercised for a racially discriminatory reason is given great deference by this court; we review that finding only for clear error." *Jones v. Plaster*, 57 F.3d 417, 421 (4th Cir. 1995); *Hernandez v. New York,* 500 U.S. 352, 369 (1991) (plurality opinion).

When making a *Batson* challenge, the defendant must first make a *prima facie* showing of purposeful discrimination. *See United States v. Malindez*, 962 F.2d 332, 333 (4th Cir. 1992). Once the defendant establishes a *prima facie* case of discrimination, the burden shifts to the Government to articulate a race-neutral explanation for the challenge. *See Batson*, 476 U.S. at 97. If the Government satisfies this requirement, the burden shifts back to the defendant to prove that the explanation given is a pretext for discrimination. *Howard v. Moore*, 131 F.3d 399, 407 (4th Cir. 1997) (en banc). The ultimate burden always rests with the opponent of the challenge to prove purposeful discrimination. *Id.* "Discriminatory purpose . . . implies more than intent as volition or intent as awareness of consequences. It implies that the decisionmaker . . . selected . . . a particular course of action at least in part because of, not merely in spite of, its adverse effects upon an identifiable group." *Hernandez*, 500 U.S. at 360. The trial court's resolution of whether the challenge was exercised for a racially discriminatory reason rests largely on credibility determinations, and therefore, we give its findings great deference. *See Jones*, 57 F.3d at 421 ("[T]he [trial] court is especially well-suited to resolve challenges to peremptory strikes of jurors because it has observed with its own eyes the very act in dispute.").

Farrior, who is African American, argues that the Government's use of a peremptory strike to exclude the only African American member of the venire panel violated *Batson*. To make out a *prima facie* case under *Batson,* Farrior had to raise at least an inference that the Government struck the potential juror based on her race. *See Batson,* 476 U.S. at 96. Farrior attempted to raise such an inference by simply arguing that both he and the prospective juror are African American. But it is well established in this circuit that a *prima facie* case of discrimination does not arise merely because "a racial minority has been struck from the venire." *Malindez*, 962 F.2d at 334. In any event, the Government articulated three legitimate race-neutral

explanations for striking the juror in question, reasons that Farrior has not shown to be pretextual. Specifically, the Government: (1) noted that the juror owned a bail bonding business and, therefore, might be sympathetic to criminal defendants; (2) struck every prospective juror who had a relative who had been arrested for drugs, which included this prospective juror, whose niece and nephew had been charged with drug related offenses; and (3) noted that the juror had previously served on a criminal jury that did not reach a verdict.

Because the Government provided race-neutral explanations for the challenged strike, the burden shifted to Farrior to prove that the explanations given were pretext for discrimination, *see Batson*, 476 U.S. at 98, which Farrior has simply failed to do. Accordingly, the district court did not clearly err in rejecting Farrior's *Batson* challenge.[2]

C.

Farrior also contends that the district court erred by denying his motion for a new trial. He argues that the district court should have granted his motion because the Government improperly defined reasonable doubt in its closing argument and improperly invited the jury to place trust in the Government, thus cumulatively lessening the Government's burden of proof in the case. Farrior's arguments focus on several statements made during closing arguments. During its closing argument, the Government discussed the importance of trust in the process of making an argument, referring to its opening state-

---

[2]Farrior argues that the Supreme Court's recent decision in *Snyder v. Louisiana*, 128 S. Ct. 1203 (2008), illustrates the inadequacy of the Government's proffered reasons for the strike of the only African American venire member at his trial. This reliance on *Snyder* is unfounded and seems to us little more than an invocation of the case simply because the *Snyder* Court found a *Batson* error. Without extended discussion, it suffices to say that *Snyder* involved starkly different facts. In *Snyder*, the Supreme Court found that the prosecutor's race-neutral explanations for his strikes of two African American venire members were implausible in light of the prosecutor's acceptance of white jurors to which the same explanations clearly applied. *Id.* at 1211. *Snyder* is thus far afield of Farrior's *Batson* challenge, which only took issue with the strike of the only African American venire member on the ground that both Farrior and the prospective juror were African American.

ments as promises of evidence and asking the jury to judge whether the promises were kept. Additionally, the Government made the following statements regarding the nature of the Government's burden:

> . . . I want to mention one thing about one of my burdens, my burden beyond a reasonable doubt. You have heard the judge talk about that a couple of times. You have heard me mention it in my opening statement.
>
> Well, what is a reasonable doubt? Because there's some misconception about what that is. I'll tell you what it is not. It is not beyond all doubt. It is not beyond every doubt. It is not beyond each and every single doubt. It is beyond a reasonable doubt, because nothing is a hundred percent certain, except for a few things: death and taxes.
>
> So that's why the law attaches a reason. Well, what is reason? You are going to hear a jury instruction from the judge defining what reasonable doubt is.[3] And a reason is based on common sense. And you will hear that. It is based on common sense.
>
> If you recall, yesterday, when we were selecting you all as jurors, okay, I don't recall anybody asking you, "can you leave your common sense at the door for a couple of days and just listen to what I tell you, but don't use your life experiences?" No. I mean, to the contrary, we want you to use your life experiences. We want you to use your common sense.
>
> So when you evaluate the evidence, you evaluate the testimony, you can ask yourself: Does that make sense? Would I do that? Does that make sense? Does that story make sense? . . .

(J.A. 289-90.) At two points following this explanation, the Govern-

---

[3]It should be noted that no such jury instruction was given by the district court.

ment stated that there was "no other reasonable explanation" for Farrior's behavior. (J.A. at 290.)

Farrior contends that while each of these statements in isolation may not be sufficient to warrant a new trial, their cumulative effect was such that the jury was given a false impression of the Government's burden of proof and its duty to weigh the Government's evidence. Farrior further argues that the Government's statements on reasonable doubt constituted an impermissible definition of the Government's burden in violation of our admonition in *United States v. Adkins*, 937 F.2d 947, 950 (4th Cir. 1991). *See id.* (expressing a "categorical disdain" for attempts at defining reasonable doubt). Because Farrior did not object to the Government's statements at issue during trial, we review the district court's decision for plain error. *See* Fed. R. Crim. P. 52(b); *United States v. Olano*, 507 U.S. 725, 733-36 (1993).[4]

We find Farrior's arguments unpersuasive. Of course, remarks made during closing arguments can be sufficient to warrant a new trial if they were improper and prejudicially affected the defendant's substantial rights. *United States v. Chorman*, 910 F.2d 102, 113 (4th Cir. 1990). The Government's statements during closing argument, however, were not improper and did not constitute an impermissible definition of reasonable doubt under *Adkins*. Indeed, the Government's remarks were substantially similar to the jury instruction statements regarding the Government's burden and reasonable doubt that we upheld in *Adkins* and in *United States v. Williams*, 152 F.3d 294 (4th Cir. 1989). *See Adkins*, 937 F.2d at 950 (finding that the district

---

[4]Under the plain error standard of review, to establish our authority to notice an error not preserved by a timely objection, a defendant must demonstrate (1) that an error occurred, (2) that the error was plain, and (3) that it affected his substantial rights. If the defendant satisfies these threshold requirements, correction of the error is within our discretion, which is "appropriately exercised only when failure to do so would result in a miscarriage of justice, such as when the defendant is actually innocent or the error seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." *United States v. Promise*, 255 F.3d 150, 161 (4th Cir. 2001) (en banc) (quoting *United States v. Olano*, 507 U.S. 725, 736 (1993)) (internal quotation marks omitted) (alteration in original)).

court's instruction that the Government's burden is not "beyond all possible doubt" did not constitute an impermissible definition of the term); *Williams*, 152 F.3d at 298 (holding that the statement that "reasonable doubt is a real doubt based upon reason and common sense and careful and impartial consideration of all the evidence in the case" was not a definition and "merely admonished the jury to exercise reason and unbiased diligence in reaching a decision.").

Here, like the statements in *Adkins* and *Williams*, the Government's statements only provided general guidance to the jury and did not undermine the jurors' lay understandings of the term reasonable doubt. Moreover, under plain error review we can in nowise say that any purported error in the Government's statements was plain, let alone that such error affected Farrior's substantial rights. Accordingly, we find no reversible error in the Government's statements to the jury.[5]

### D.

Finally, we turn to Farrior's various arguments that the district court erred in sentencing him to life imprisonment.

### 1.

First, Farrior contends that the district court erred in considering his 1993 conviction as a predicate conviction for purposes of sentencing him as a career offender. He argues that the certified, signed copy of his 1993 conviction relied on by the district court is constitutionally deficient under *Shepard v. United States*, 544 U.S. 13 (2005), because it did not have an actual judge's signature, but rather only contained an "Authorized Signature." (Appellant's Br. at 22.)

We review the district court's factual findings for clear error and its classification of Farrior as a career offender *de novo*. *United States v. Johnson*, 114 F.3d 435, 444 (4th Cir. 1997); *United States v. Dawkins*, 202 F.3d 711, 714 (4th Cir. 2000). In reviewing prior con-

---

[5]Indeed, the jury was specifically instructed by the district court that it was not to consider the arguments made by the attorneys as evidence in determining guilt or as statements of the law to be applied in the case.

victions to determine whether they count as a predicate offense for career-offender purposes, the Supreme Court has instructed us to review "the charging document, the terms of a plea agreement or transcript of colloquy between judge and defendant in which the factual basis for the plea was confirmed by the defendant, or . . . some comparable judicial record of this information." *Shepard*, 544 U.S. at 26. In keeping with *Shepard*, the district court relied on Farrior's formal conviction records to determine the nature of his 1993 conviction. Specifically, the district court relied on a certified, signed copy of Farrior's 1993 conviction from the State of Connecticut Superior Court, the court of conviction, which was produced by the Government at the sentencing hearing. Even if this record only contained an authorized judicial signature, it was clearly sufficient under *Shepard* to establish the predicate nature of Farrior's 1993 conviction. In any event, the district court found that the order was, in fact, signed by the presiding judge. We thus conclude that the district court did not err in counting Farrior's 1993 conviction for purposes of sentencing him as a career offender.[6]

---

[6]Farrior also suggests that the district court erred by not giving him an adequate opportunity under 21 U.S.C.A. § 851 (West 1999 & Supp. 2008) to contest the Government's contention that he was subject to the career offender enhancement under 21 U.S.C.A. § 841(b)(1)(A) (West 1999 & Supp. 2008). He bases this contention on the fact that the district court spent most of its time at the sentencing hearing discussing U.S. Sentencing Guidelines Manual §4B1.1 (2006), the career-offender guideline, and not the enhancement under the statute. To be sure, § 851 "was enacted to insure that defendants are given reasonable notice and opportunity to be heard, which includes the opportunity to contest the evidence or challenge a prior conviction if the defendant might be subject to a greater sentence than would otherwise be imposed." *United States v. Jackson*, 121 F.3d 316, 319 (7th Cir. 1997). Here, it is clear that, even though the district court couched its discussion of Farrior's predicate convictions in terms of the Guidelines enhancement, Farrior was given sufficient opportunity to challenge the predicate nature of his 1993 conviction. Indeed, the predicate status of the 1993 conviction was one of the focal points of the sentencing hearing.

2.

Farrior also argues that his sentence was excessive and unreasonable. Under *Gall v. United States*, 128 S. Ct. 586 (2007), we review sentences under a deferential abuse-of-discretion standard. *Id.* at 591. At the sentencing hearing, the district court determined that Farrior was subject to the career-offender enhancement under §4B1.1 of the Sentencing Guidelines. *See* U.S. Sentencing Guidelines Manual §4B1.1 (2006) (describing career-offender enhancement). According to the statement of reasons included in the district court's judgment, the district court ultimately imposed a mandatory life sentence pursuant to 21 U.S.C.A. § 841(b)(1)(A).[7] A statutorily required sentence, which is what Farrior received, is *per se* reasonable, and this challenge is without merit.[8]

---

[7]Section 841(b)(1)(A) provides, in pertinent part:

> If any person commits a violation of this subparagraph . . . after two or more prior convictions for a felony drug offense have become final, such person shall be sentenced to a mandatory term of life imprisonment.

21 U.S.C.A. § 841(b)(1)(A).

[8]Finally, Farrior urges us to remand his case for re-sentencing in the wake of Amendment 706 to the Guidelines, which lowered the base offense level for drug offenses involving crack cocaine. *See* U.S. Sentencing Guidelines Manual §2D1.1 (Nov. 1, 2007); U.S.S.G. Supp. to App'x C, Amend. 706. Farrior was sentenced on April 24, 2007, prior to the November 1, 2007 effective date of Amendment 706. Amendment 706, however, has been made retroactive, effective March 3, 2008. *See* U.S.S.G. §1B1.10(c) (Mar. 3, 2008).

Although Amendment 706 has been made retroactive, after the briefs in this case were filed, we expressly held in another case that it is "for the district court to first assess whether and to what extent [a defendant's] sentence may be thereby affected, and [the district] court is entitled to address this issue either sua sponte or in response to a motion by [the defendant] or the Bureau of Prisons." *United States v. Brewer*, 520 F.3d 367, 373 (2008). Accordingly, we decline to consider Farrior's request for re-sentencing without prejudice to his right to pursue relief in the district court. We do note, however, that Farrior has a mandatory minimum life sentence, so any re-sentencing on Count One will not affect the term that he will serve.

III.

For the foregoing reasons, Farrior's convictions and sentence are

*AFFIRMED*.